Morton **SOBELL,** Plaintiff,

v.

George J. **REED,** Chairman, United States Board of Parole, United States Department of Justice, et al., Defendants.

**No. 70 Civ. 1420.**

United States District Court, S. D. New York.

May 20, 1971.

Burt Neuborne, New York Civil Liberties Union, New York City, for plaintiff.

Whitney North Seymour, Jr., U. S. Atty., for the S. D. of New York, New York City, for defendants; David M. Brodsky, Asst. U. S. Atty., of counsel.

## OPINION

FRANKEL, District Judge.

On April 5, 1951, Morton Sobell was given a maximum prison sentence of 30 years for conspiring, between 1944 and 1950, to transmit national defense (atomic bomb) information to the Soviet Union.[1]  On January 14, 1969, upon the basis of "good time" earned, 18 U.S.C. § 4161, he was mandatorily released, 18 U.S.C. § 4163.  This means that he is now "deemed as if released on parole until the expiration of the maximum term * * * for which he was sentenced less one hundred and eighty days," 18 U.S.C. § 4164, or, specifically, until September 26, 1980.  Thus subjected to the continuing jurisdiction of the United States Parole Board, Sobell was presented upon his release with a "Certificate of Mandatory Release," providing that until the end of the period during which he was to remain "as if on parole" he would be governed by the standard "Conditions of Parole" set out on

1.  The statute provided for the death sentence or imprisonment for up to 30 years.  Two codefendants, Julius and Ethel Rosenberg, were sentenced to death and later executed.  See United States v. Rosenberg, 195 F.2d 583, 590 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687 (1952), rehearing denied, 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 652 (1952), stay vacated 346 U.S. 273, 73 S.Ct. 1152, 97 L.Ed. 1607 (1953).

the reverse side of the Certificate and reproduced here in a footnote.[2] Sobell refused to sign the Certificate, but that appears to be of no consequence for present purposes. The court has proceeded upon the view that the Conditions, to the extent they may validly do so, govern Sobell until 1980.

Of most direct interest in the case now before the court is the third Condition, under which Sobell was not to go outside the limits of the Southern District of New York "without written permission from the probation officer." On a number of occasions after his release, he sought and obtained permission to travel to, and speak at, various places—a Philadelphia television guest appearance, a Cleveland radio and television show, and a speech to students at the Massachusetts Institute of Technology. On other occasions, however, similar requests have been denied:

(1) A request for leave to be in Washington, D. C., for a November 15, 1969, demonstration against the war in Vietnam.

(2) A similar request relating to a demonstration on April 15, 1970.[3]

(3) A request for permission to go to Los Angeles, California, to speak on prison conditions at a banquet sponsored by *People's World*, a newspaper which, as stipulated for purposes of this suit, "is closely

2. "1. You shall go directly to the district shown on this CERTIFICATE (unless released to the custody of other authorities). Within three days after your arrival, you shall report to your adviser if you have one, and to the United States Probation Officer whose name appears on this Certificate.

"2. If you are released to the custody of other authorities, and after your release from physical custody of such authorities, you are unable to report to the United States Probation Officer to whom you are assigned within three days, you shall report instead to the nearest United States Probation Officer.

"3. You shall not leave the limits fixed by this CERTIFICATE without written permission from the probation officer.

"4. You shall notify your probation officer immediately of any change in your place of residence.

"5. You shall make a complete and truthful written report (on a form provided for that purpose) to your probation officer between the first and third day of each month, and on the final day of supervision. You shall also report to your probation officer at other times as he directs.

"6. If in any emergency you are unable to get in touch with your adviser, or your probation officer or his office, you shall communicate with the United States Board of Parole, Department of Justice, Washington, D.C.

"7. You shall not violate any law. You shall get in touch immediately with your probation officer or his office if you are arrested or questioned by a law-enforcement officer.

"8. You shall not enter into any agreement to act as an 'informer' or special agent for any law-enforcement agency.

"9. You shall work regularly unless excused by your probation officer, and support your legal dependents, if any, to the best of your ability. You shall report immediately to your probation officer any changes in employment.

"10. You shall not drink alcoholic beverages to excess. You shall not purchase, possess, use, or administer marihuana or narcotic or other habit-forming or dangerous drugs, unless prescribed or advised by a physician. You shall not frequent places where such drugs are illegally sold, dispensed, used or given away.

"11. You shall not associate with persons who have a criminal record unless you have permission of your probation officer. Nor shall you associate with persons engaged in criminal activity.

"12. You shall not have firearms (or other dangerous weapons) in your possession without the written permission of your probation officer, following prior approval of the United States Board of Parole.

"I have read, or had read to me, the foregoing conditions of supervision. I fully understand them and know that if I violate any of them, I may be recommitted. I also understand that special conditions may be added or modifications of any condition may be made by the Board of Parole at any time."

3. A still later request of the same kind, for permission to be in Washington on April 24, 1971, to demonstrate against the war, was granted.

identified with the Communist Party \* \* \* and is generally reflective of the positions taken on public issues by the Communist Party."

Early in April of last year Sobell commenced the present suit against the Chairman and Members of the Parole Board in the District Court for the District of Columbia. He charged that defendants' refusal to permit him to travel invaded First Amendment rights. He seeks, to quote the amended complaint now before us, a declaratory judgment and "appropriate equitable relief in the form of injunction or mandamus enforcing plaintiff's rights and defendants' responsibilities under the First and Fifth Amendments to the Constitution of the United States." On defendants' motion the case was transferred to this court.

On October 7, 1970, Judge Ryan denied plaintiff's motion for a preliminary injunction. Recognizing the undisputed fact that nobody was suggesting a prospect of unlawful activities by Sobell on any of the trips forbidden by the Board, Judge Ryan concluded that the denials of permission had been proper exercises of the Board's authority. He said:

"The Board of Parole has broad powers and authority to set the terms of supervision of a released convict. There is no showing that it has abused or exceeded the power granted to it by statute. I hold that there is no showing of any arbitrary act of the Board which supports or justifies judicial intervention."

Two days later that decision was affirmed by the Circuit in open court. The Court of Appeals recorded a brief "Decision" reading in full this way:

"In light of the serious jurisdictional questions and the lack of irreparable injury from inability to make a single speech at a fund raising dinner the court affirms Judge Ryan's denial of a temporary injunction. The issues raised by Sobell and the Government will remain for disposition by the district court after a fuller hearing."

On the following day, Mr. Justice Harlan refused interim relief of the kind both lower courts had denied. Briefly recording his views in the short time available, the Justice said he was "satisfied that at the very least petitioner's appeal to the Court of Appeals, apart from the jurisdictional question, presents novel questions as to the scope of the United States Parole Board's discretion."

In the months since then, there have been a few procedural developments that are no longer of interest. Others, as will appear, are quite interesting. The court is confronted now with what amount to cross-motions for summary judgment. It is agreed all around that the repeated and projected refusals of travel for purposes of speech and assembly present live questions (subject to the dispute considered later as to the court's jurisdiction) and that there is a record of undisputed facts sufficient for decision. Upon a more detailed review of the facts, and for the reasons hereinafter outlined, the court must rule for the plaintiff.

## I.

In an affidavit opposing plaintiff's motion for a preliminary injunction last October, Hon. George J. Reed, Chairman of the Board of Parole, gave the following explanation of the refusal to allow Sobell to address the *People's World* meeting in Los Angeles:

"6) The Parole Executive of the U. S. Board of Parole, James R. Pace, brought the request before me as Chairman of the Board of Parole for consideration; thereafter I conferred with Members of the U. S. Board of Parole and thoroughly discussed the requested permission to travel to attend and address the meeting sponsored by 'The People's World.'

"7) In considering the request the Board took into consideration the same criteria which are considered in acting upon the request of any mandatory releasee under the jurisdiction of this Board for permission to leave his district of supervision. In discussion, we reviewed the nature of Morton Sobell's

conviction in light of his admission that the newspaper sponsoring the meeting was reputedly 'communistic.'

"8) The Board's decision, made within its discretion under 18 U.S. Code, 4203, was to deny the requested permission on the grounds that a grant of permission to participate in and address the meeting under the circumstances described by Morton Sobell including his description of the sponsor of the meeting as 'communistic,' would not be in the public's interest or conducive to his rehabilitation during service under mandatory release of his sentence for Conspiracy to Commit Espionage."

These brief words were all he said on the subject. Nothing was said about the refusals of permission to attend the antiwar demonstrations in Washington in November 1969 and April 1970.

When the present motion came on for argument, the court requested further enlightenment as to the latter refusals and as to whether the Board would deem it proper to deny Sobell permission to speak before a group like that of the *People's World* if the speech were scheduled to be made within the Southern District of New York rather than in Los Angeles. Mr. Reed made another affidavit, this one dated March 23, 1971. As in the earlier one, he reviewed Sobell's conviction for espionage, the 30-year sentence, the release from prison and the Conditions. Then, in response to the court's questions, he went on to write as follows:

"(4) The Board of Parole sitting en banc denied permission for Morton Sobell to travel to Washington, D. C. for participation in the November 15, 1969 peace demonstration, for the reasons that the Department of Justice had found and publicly announced that there would be a substantial likelihood of serious violence during the mass march of November 15, 1969, by a minority of disruptive elements planning to infiltrate the march as reflected in the press releases dated November 4 and November 6, 1969, and the report of the Deputy Attorney General's Press Conference on November 6, 1969 (copies attached); that certain persons with Communist Party affiliations had announced their planned participation in the said march; that the Internal Security Division of the Department of Justice had assured the Board that ample evidence existed for the conclusions expressed above; and that in view of these findings as well as the nature of Sobell's conviction for Conspiracy to Commit Espionage and the length of the sentence which he was serving in custody of the Attorney General under Parole Board supervision, it would not be in the interest of the public nor of the subject's rehabilitation under mandatory release supervision for him to travel from his district of supervision and participate in the said peace march.

"(5) The Board sitting en banc denied permission for Morton Sobell to travel to Washington, D. C. to participate in the April 15, 1970 demonstration for similar reasons; namely, that the Board had been informed by the Internal Security Division of the Department of Justice that there was substantial likelihood of serious violence during the mass march and demonstration focused on the buildings of the Internal Revenue Service, including the possibility of attempts unlawfully to enter the Internal Revenue Service buildings, and there was the possibility of Sobell's becoming involved, in the course of the mass march situation, in the possible illegal activities by the marchers.

"(6) With respect to denial of permission to Morton Sobell to participate in both of the aforesaid so-called peace marches, no basis for denial was found on the grounds of the 'radical character' of certain groups participating in the march other than persons affiliated with the Communist Party; rather the denial was based on the Board's information concerning substantial likelihood of serious violence and the necessity of not endorsing par-

ticipation in such potentially violent or illegal demonstrations by a person serving a sentence in the custody of the Attorney General under Parole Board supervision. With respect to the November 15, 1969 demonstration, the Board also considered the fact that it was alleged that certain persons affiliated with the Communist Party would participate in the march, this in connection with the fact that the sentence which Sobell was still serving was for Conspiracy to Commit Espionage.

"(7) No request has been received from Morton Sobell for permission to address a fund raising dinner for the *People's World* in New York City, but an attempt will be made to answer the Court's hypothetical question. On this question, I cannot speak for the other Members of the Board of Parole and of course the precise factual setting of any such specific request would govern the decision. However with such necessary qualifications, I state that I would recommend that the Board deny permission for Morton Sobell to address and associate with persons engaged in fund raising activities for *People's World,* which Morton Sobell has characterized as a 'Communistic' paper since it would not be per se desirable or compatible with the public welfare or the rehabilitative purposes of the parole system, inasmuch as Sobell is still serving his sentence in custody of the Attorney General under the Board's supervision for Conspiracy to Commit Espionage stemming from his Communist Party affiliations in the past, according to evidence introduced at his trial. For purposes of the Court's hypothetical question, I have made further inquiries of the Internal Security Division of the U. S. Department of Justice and the Internal Security Division has made available to me the attached memorandum which shows that the *People's World* may truly be considered an organ of the Communist Party of the United States.

"However, it is my belief that the Board's policy regarding supervision of Morton Sobell would not in the future preclude permission to Morton Sobell, within his district of supervision, to address or to associate with any group of citizens not known to be identified with or directly related to the Communist Party. (The record of Morton Sobell's conviction includes evidence of his membership in and recruitment for the Communist Party, introduced to demonstrate that such Communist Party affiliation furnished his motivation for his participation in the Conspiracy to Commit Espionage in collaboration with agents of the Union of the Soviet Socialist Republics, United States v. Rosenberg, 195 F.2d 583 (C.A.2 1952).) Requests by Morton Sobell to address other public groups have in the past been granted, and the Board would in my judgment interpose no objection in the future to requests by Morton Sobell to address such other groups on any topic of his choosing or to associate with such other groups."

Studying this lengthier recital together with the earlier one, the court found that the net result had been to generate at least as many questions as answers:

(1) Did the Board, without hinting at this, suspect that Sobell would be among the "minority of disruptive elements planning to infiltrate the march" in November?

(2) What was or is the "interest of the public" threatened by allowing Sobell to join demonstrators against the war?

(3) What "rehabilitation" has Sobell undergone, or is he hoped to be undergoing, that would be adversely affected by his demonstrating or making a speech to Communists or "communistic" people in Los Angeles (or New York)?

(4) What was meant by "the possibility of Sobell's becoming in-

volved, in the course of the mass march situation, in the possible illegal activities by the marchers" in April 1970?

(5) How could the Board, by allowing Sobell to demonstrate, be thought to be "endorsing participation in * * * potentially violent or illegal demonstrations by a person serving a sentence in the custody of the Attorney General under Parole Board supervision"?

(6) Where, in the absence of anything seemingly germane in its own "Conditions of Parole," did the Board (or its Chairman) derive claimed authority to restrict Sobell's speech in New York, without travel? And, in the end, was not the Board really talking about asserted powers to limit speech and assembly *anywhere* rather than travel?

Puzzling over such questions, the court convened a meeting of counsel. Both sides agreed that there was record enough for a decision on the merits.[4] Sobell's counsel, not surprisingly, was pleased to deem the two Reed affidavits a full exposition of the Board's views. The court, questioning the suitability of that—and cognizant that the Board, characteristically, had written no opinion or anything else to explain its position— proposed informally that Chairman Reed and any or all the Board Members should appear in court to answer the open questions. Cf. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Shaughnessy v. United States ex rel. Accardi, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955). Government counsel suggested we ought perhaps to hear the Parole Executive instead, but that seemed unsatisfactory; the Government had begun by claiming there were material issues of fact, had itself offered the Reed affidavits, and was relying upon the discretionary judgment of the Board, not its

Executive. It was then suggested that Mr. Reed has a crowded calendar in Washington, whence this case was transferred last year on the Government's motion. The court offered, if Mr. Reed thought that better and if all agreed, to hear his testimony in Washington. The Government then urged that Mr. Reed should have his deposition taken rather than appearing before the court. This willingness to turn up at an office or somewhere to give testimony, but to avoid at all costs being available in person to impress and enlighten the court, reflected no discernible reason of principle or policy, and the court indicated it would not be satisfactory. Without issuing a formal order, the court set May 3, 1971, as a day for hearing Mr. Reed and any of his colleagues who might be called.

It now develops that Mr. Reed, as confirmed in a letter from the United States Attorney, "respectfully declines to appear * * *." He proposes as alternatives "that he will answer specific and general questions * * * by interrogatories addressed to him or will submit affidavits supplying the answers to those questions." If that is not thought sufficient by the court, he requests "that the Court decide the motions on the basis of the extensive record presently before it which both plaintiff and defendants concede is now in an appropriate state for immediate entry of summary judgment." He acknowledges the possibility that his affidavits may be stricken and also that the court might move toward more dramatic events by formally ordering him to appear. He recalls that "inquiry into the mental processes of administrative decision makers is usually to be avoided," quoting Citizens to Preserve Overton Park, Inc. v. Volpe, *supra*, 401 U.S. at 420, 91 S.Ct. at 825. He acknowledges that other subordinates of the Attorney General have come to court to vouchsafe justifications of their conduct, even though they were a group that regularly gives explanations

---

4. The court had already indicated (see "II," *infra*) that it would take jurisdiction and reach the merits.

of a kind we do not get from the Board of Parole, see Shaughnessy v. United States ex rel. Accardi, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955), and that this does not appear to have skewed unduly the balance among the branches of government. He says that the call for an explanation to the court is less suitable for his Board than for the Department of Transportation, see Citizens to Preserve Overton Park, Inc. v. Volpe, *supra*, 401 U.S. at 420, 91 S.Ct. at 825 "because the decisions of the Board are not subject to review under the Administrative Procedure Act," an explanation this court finds wrong in the circumstances of this case (see "II," *infra*).

The net of all this is that the court will defer to the joint preference of the parties and decide now, granting summary judgment for plaintiff. The plaintiff has waited over a year for decision of claims under the First Amendment which nobody doubts are at least substantial. The Parole Board, giving full weight to its large responsibilities, has had more than the opportunity normally available to agencies not less august to supply the rationale for its action. Traditionally unaccustomed to giving any explanations at all,[5] the Board misconceives its own functions and the relations between courts and agencies when it offers to extrude further justifications for its position only under the pressure of further interrogatories. It is for the responsible agency, after all, to be forthcoming with, and bound by, its own rationale, cf. Securities and Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), not to challenge the courts and affected persons to figure out means of extraction.

Mr. Reed's affidavits will not be stricken. They have been considered with care. For reasons outlined below, they are totally inadequate to justify the restrictions upon First Amendment freedoms to which the plaintiff has been subjected.

## II.

Plaintiff asserts three grounds for subject-matter jurisdiction in this court: the "federal question" provision, 28 U.S.C. § 1331, the mandamus power, 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. Finding the third of these compelling, the court deems it unnecessary to rule definitively upon either of the others.[6]

It is not seriously questioned, or questionable, that plaintiff asserts substantial claims (valid ones, as this court holds when the merits are reached) that the Board of Parole has violated his First Amendment rights. It is not suggested that the Board of Parole, whatever its expertise, has credentials qualifying it to rule finally upon such claims. Indeed, it is not indicated that the Board even purported to make a constitutional adjudication in any remotely adequate, adversary fashion. But it is urged that the Board's action is outside the court's power of review. It would be surprising, and gravely questionable, if Congress had meant to confer such final authority upon *any* administrative agency, particularly one that makes no pretense to learning in constitutional law. It would be bizarre to hold, as the Government's position ultimately entails, that assertions of constitutional rights like those made here may be overridden without ever being faced and decided by

---

5. See K. C. Davis, Discretionary Justice 11, 14, 126–137 (1969).

6. It may be observed, however, that both of those alternatives have weighty support. As to the claim under 28 U.S.C. § 1331, on which defendants say the $10,000 minimum requirement is not met, see Cortright v. Resor, 325 F.Supp. 797 (E.D.N.Y.1971), and citations therein; Murray v. Vaughn, 300 F.Supp. 688

(D.R.I.1969). As to 28 U.S.C. § 1361, see Long v. Parker, 390 F.2d 816 (3d Cir. 1968); Walker v. Blackwell, 360 F.2d 66 (5th Cir. 1966); National Ass'n of Government Employees v. White, 135 U.S.App.D.C. 290, 418 F.2d 1126, 1129 (1969). See generally Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308 (1967).

any tribunal of any kind. But there is no occasion to become upset over such implications. The Government's position is not soundly based.

■ There is jurisdiction and a "presumption of reviewability embodied in the Administrative Procedure Act * * *." Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97, 101 (2d Cir.), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970). This is not one of the exceptional cases in which

"(1) statutes preclude judicial review; or

"(2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

To be sure, the Parole Board "is vested with broad discretion to set the terms and conditions on which a parolee may be released. See 18 U.S.C. § 4203 (1964)." United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161, 1166 (2d Cir. 1970) (Kaufman, J., concurring). It is not the law, however, that such "discretion" embraces authority to decide finally questions of constitutional right. For Parole Board members and "prison officials are not judges. They are not charged by law and constitutional mandate with the responsibility for interpreting and applying constitutional provisions * * *. We do not denigrate their views but we cannot be absolutely bound by them." Brown v. Peyton, 437 F.2d 1228, 1232 (4th Cir. 1971).

The Assistant United States Attorney, on argument of the instant motion, appeared to concede that a court could and should take cognizance of a claim that parole was denied or revoked, or the freedom of a releasee circumscribed, on grounds of race or religion. But this gives up a ship the Government's law officers might better not have launched in the first place. For the First and Fifth Amendment claims tendered by Sobell are identical in constitutional principle with those to which that sound concession extends.

■ Broadly speaking, agency action attacked on constitutional grounds "could

be immune from judicial review, if ever, only by the plainest manifestation of congressional intent to that effect." Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570, 575 (1964) (Burger, J.), and authorities cited. But the case against such "immunity" is clear in the domain of the First Amendment. Even where the subject is assertedly dirty books rather than the core area of arguably protected "political" speech, see New York Times v. Sullivan, 376 U.S. 254, 269–272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), "only a procedure requiring a [prompt] judicial determination suffices to impose a valid final restraint." Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). Thus, where an agency has power to block or withhold publications as obscene, not only is the action subject to judicial review, but the statute under which the administrators act will be struck down unless it affirmatively and expressly requires the agency itself to initiate proceedings for judicial review. Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); and see United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 367, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971).

It flies in the face of that learning to argue, as the Government does, that we should strain now to read into the law some barrier to a judicial hearing of claims that the Parole Board has violated First Amendment rights. The argument is rejected. We proceed to the merits.

### III.

It is wholly clear—indeed, there is no contrary suggestion—that the concern of the Parole Board is not about travel as such. Travel may, of course, pose special problems of parole supervision, but the focus of the Board's actions in this case is upon Sobell's plans for speech and association when he travels. He has been permitted to make long trips when the things he has planned to say and do upon arrival have seemed meet to the Parole Board. The Board has both granted and denied permission for him to go

to Washington to demonstrate against the Vietnam war—depending on whether the Board has received information leading it to perceive a "possibility of Sobell's becoming involved in the course of the mass march situation, in the possible illegal activities by the marchers." Such possibilities of possibilities do not arise from fears or suspicions about how Sobell himself plans to behave in expressing his views; it has been conceded throughout that there is no basis to suspect that he contemplates criminal or other misbehavior. Instead, the Board has been guided by unparticularized "information" about how others may possibly behave. Finally, to highlight that the subject is speech and assembly rather than travel, Board Chairman Reed, while expressing only his own view, says he "would recommend that the Board deny permission for Morton Sobell to address and associate with persons engaged in fund raising activities for *People's World*" even if such an address and association involved no travel outside New York City. The Chairman does not indicate where in the Conditions of Parole (*supra* note 2) he would find grounds for so restricting Sobell's right "to address and associate with persons" in a City within which the latter is presumably free to move at will. And the court perceives no such grounds. But passing that, the point of present importance is the underscoring of the fact that our concern is with First Amendment activities.[7]

■■ Whatever may once have been the case, it is not doubtful now that the Constitution, and notably the First Amendment, reaches inside prison walls. The freedoms of conscience, of thought and of expression, like all the rest of life, are cramped and diluted for the inmate. But they exist to the fullest extent consistent with prison discipline, security

and "the punitive regimen of a prison * * *." Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir. 1971); Jackson v. Godwin, 400 F.2d 529, 532–535 (5th Cir. 1968); Long v. Parker, 390 F.2d 816, 820, 822 (3d Cir. 1968); Sostre v. McGinnis, 442 F.2d 178, 199–203 (2d Cir. 1971); Fortune Society v. McGinnis, 319 F.Supp. 901, 903–905 (S.D.N.Y. 1970); Carothers v. Follette, 314 F. Supp. 1014, 1023–24 (S.D.N.Y.1970). There is weighty authority for the view that only a "clear and present danger" of substantial evils (such as breaches of prison security or discipline) can justify curtailment of First Amendment expression by prisoners. E. g., Long v. Parker, *supra*, 390 F.2d at 822; Fortune Society v. McGinnis, *supra*, 319 F.Supp. at 904. But if that endlessly debated "test" might inject a note of uncertainty here, see Sostre v. McGinnis, *supra*, 442 F.2d at 202, n. 48, there seems to be no question that prisoners' First Amendment rights may be cut down only (to cite a range of phrasings) where the restrictions are "related both reasonably * * * and necessarily * * * to the advancement of some justifiable purpose of imprisonment," *Carothers, supra,* 314 F.Supp. at 1024; where there is justification in some "compelling state interest," *Fortune Society, supra,* 319 F. Supp. at 905; where the authorities "strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement," Jackson v. Godwin, *supra,* 400 F.2d at 541. Alleged infringements, and asserted justifications for them, will be tested by "stringent standards" and subjected to "rigid scrutiny * * *." *Id.* And here, as elsewhere, it seems appropriate to recall that speech is to "be unencumbered until the State comes forward with sufficient

---

7. This is not to say, one way or the other, what the Constitution might be found to provide about rights of parolees or releasees to travel. Cf. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Aptheker v.

Secretary of State, 378 U.S. 500, 517, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

proof to justify its inhibition." Speiser v. Randall, 357 U.S. 513, 529, 78 S.Ct. 1332, 1343, 2 L.Ed.2d 1460 (1958).

■ While there are differences between prisoners and parolees (or released persons like Sobell), there are none that diminish the protections enjoyed by the latter under the First Amendment. So the principles of the foregoing cases apply here. Cf. Hyland v. Procunier, 311 F.Supp. 749 (N.D.Cal.1970); United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161, 1164 (2d Cir. 1970).[8] Tested by those principles, the actions of defendants in denying Sobell's requests to speak and assemble with others in public—and denying to others the hearing of his views on prison conditions [9] and other things—violate the First Amendment.

■ Upon what Chairman Reed calls "findings" (namely, public announcements by the Department of Justice and things of which the Department's Internal Security Division had privately "assured" the Board), the Board concluded "it would not be in the interest [1] of the public nor [2] of the subject's rehabilitation * * * for him to travel * * * and participate in the * * * peace march" of November 16, 1969. The same coupling of reasons—that it "would not be in the public's interest or conducive to his rehabilitation"—accounted for denial of permission for the *People's World* speech and of the second request for leave to march in Washington. If the Board were held even to modestly rigorous standards in explaining itself, both parts of this pair of justifications, steadily conjoined as they are,

would need to be sustained if the agency's actions were to be upheld. But there is no need to dwell upon that. Neither of the asserted grounds is substantial.

To start with the Board's superficially most arguable point, the reasoning seems to run this way: (1) Sobell was a Communist; (2) he conspired in 1944–50 to spy for the Russians; (3) if he now appears as a public speaker before a Communist group, or joins in a march that is likely to number some Communists in its ranks, then, presumably,[10] he may be led in the direction of crimes like the one for which he was convicted in 1951. This has not been phrased here to sound silly; it is the most the court can make of what the Board has said. But it is indeed silly. Granting that unmasked spies are by definition among the failures in their profession, only an idiot too ineffectual to frighten the United States of America would use the medium of a public oration, cleared with his Parole Board, as the means of resuming his subversive work. But that, after all, is the sum of the gravest danger to be gleaned from what the Board tells us. If Sobell means to spy, or to do other things comparable to those for which he sojourned so long in prison, there are surely means more potentially effective in the tunnels and warrens of New York City than in the spotlight of a public banquet in Los Angeles. And if he desires to carry on espionage in Los Angeles, he could easily give a reason for travel of which the Board would approve. We may have slipped at times from the heights on which a new nation planted the banner of freedom, risking

8. Obviously, the specific problems will differ. Sobell's request for permission to travel gives rise to a claim that one in prison could not bring. In general, it would seem that one on parole should enjoy greater freedom in all respects than one still confined. But the fundamental issues of constitutional law are considered for present purposes as being essentially identical.

9. "When a parolee speaks publicly about prison conditions his speech may be particularly important, since he is one

of the few sources of information that society has about this subject." 84 Harv. L.Rev. 1727, 1731 n. 18 (1971).

10. "Presumably," because neither Mr. Reed nor the Board has ever come to the point of saying the thought completing the sentence in the text. If the court's conclusion does not capture the Board's unspoken analysis, this serves only to underscore the genuine need to have our administrative experts supply their own, intelligible accounts of how they arrive at their conclusions.

the dangers of robust, wide-open, vituperative, and, let it be faced, potentially subversive speech. But surely the kind of naive and chimerical fear the Parole Board posits cannot be taken as a respectable, let alone "compelling," justification for denying anyone the right to speak or demonstrate.

The Board's other observations are still less impressive. The fact that among tens of thousands of Washington demonstrators, an unidentified few, nowhere intimated to be connected with Sobell, might be Communists, might "possibly" infiltrate and make trouble, and might lead to Sobell's "possibly" being where the trouble was—this, however it was meant, cannot be taken seriously as grounds for denying First Amendment rights.

Finally, there is the shibboleth of "rehabilitation." The word is, of course, from the domain of what ought to be the Parole Board's professional competence. But it has—at best, on the present empty record—no content.[11] Totalitarian ideologies we profess to hate have styled as "rehabilitation" the process of molding the unorthodox mind to the shape of prevailing dogma.[12] Nothing in what the Board submits contains any explicit suggestion of that sort, and

the court infers no such alien premise. But there is nothing explicit of any kind. The court, having asked in vain for enlightenment, is left totally in the dark as to what is supposed to have happened thus far to Sobell by way of rehabilitation, and, more importantly, what is happening to him now, that may be diverted or impaired if he speaks or marches as the Board has forbidden him to do.[13]

The court concludes, in sum, that the Parole Board has shown nothing even "reasonable"—certainly, nothing "necessary" or "compelling"—to justify its chilling course. The plaintiff should be freed of restraints like those of which he complains.

IV.

The fashioning of suitable relief is a bit subtle. Nothing done now should, or may, impair the Parole Board's ongoing authority to supervise Sobell's conduct until the expiration of his quasi-parole in 1980. All that may properly be done is to correct the Board's unconstitutional course of impairing his rights to speak, assemble and otherwise express his views.

■■■ Within these limitations plaintiff's motion for summary judgment will be granted and a decree will be entered

---

11. We do not analogize schools to prisons, but merely recall First Amendment protection broad enough to embrace both, when we note that officials of secondary schools exercising controls in this area "must demonstrate a reasonable basis for interference with student speech, and that courts will not rest content with officials' bare allegation that such a basis existed." Eisner v. Stamford Board of Education, 440 F.2d 803, 810 (2d Cir. 1971).

12. The notion of "rehabilitation" in the sense of "political and thought reform" [Cohen, The Criminal Process in the People's Republic of China 256 (1968), the quotation being from a Chinese source and appearing in a chapter on the Chinese Communist sanction called "Rehabilitation through Labor"] may be among the most apt of shorthand expressions to capture the antithesis of our "First Amendment right of the individual to be free from governmental programs

of thought control, however such programs might be justified in terms of permissible state objectives." United States v. Reidel, 402 U.S. 351, 819, 91 S.Ct. 1410, 1413, 28 L.Ed.2d 813 (1971) (Harlan, J., concurring).

13. Accepting that Sobell was led to his crime and the loss of his prime years in prison by adherence to a totalitarian ideology, we may note the cogent point of his Civil Liberties Union counsel that the lure of democracy is not enhanced by grudging, niggardly, fearful treatment of political speech. As nearly as the elusive goal of "rehabilitation" is in our picture, it is probably best approached by avoiding degrading and distrustful restrictions of the kind the Parole Board seeks to maintain. Cf. Barnett v. Rogers, 133 U.S.App.D.C. 296, 410 F.2d 995, 1002 (1969); Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968); Carothers v. Follette, 314 F.Supp. 1014, 1025 (S.D. N.Y.1970).

declaring unlawful defendants' refusals to permit plaintiff's travel (1) to participate in the demonstrations of November 14, 1969, and April 14, 1970, (2) to speak at the *People's World* meeting of October 9, 1970, and (3) to engage in similar activities hereafter. The decree will, in addition, forbid defendants to prevent, or to withhold permission for, plaintiff's exercise of rights of speech, expression or assembly normally protected (for non-prisoners and non-releasees) by the First Amendment, except upon a showing that such prevention or withholding of permission is necessary to safeguard against specific, concretely described and highly likely dangers of misconduct by plaintiff himself. The decree will preserve defendants' powers of supervision in all other respects, including the power to require notices of travel outside this District, proposed itineraries and reasonable measures of supervision while traveling. The usual provision for retained jurisdiction in equity may have special point here and will be expressly noted.

A decree will be settled along the foregoing lines, subject to possible revision and corrections following the presentation of adversary views.[14]

14. The court's outline of a proposed decree tracks closely the terms proposed by plaintiff. There has been no opposed submission for defendants, however, and time is now provided for settling a decree so that the court may have the benefit of the Government's views.