Lloyd E. KISNER, Jr., et al., Plaintiffs,

v.

Earl L. BUTZ, individually and as United States Secretary of Agriculture, et al., Defendants.

Civ. A. No. 72-127-E.

United States District Court,
N. D. West Virginia.

Oct. 27, 1972.

Willis O. Shay and Patrick J. Deem, Steptoe & Johnson, Clarksburg, W. Va., for plaintiffs.

Paul C. Camilletti, U. S. Atty., Wheeling, W. Va., for defendants.

MAXWELL, Chief Judge.

The issues of this litigation, incubated amid emerging principles of environmental law, search for the permissible outer limits in one area of the decision making process of federal agencies.

This engaging case is structured upon the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, et seq. Jurisdiction of this citizens' suit is established under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701 to 706. Also involved, in a peripheral way, are the Multiple Use Act, 16 U.S.C. §§ 528–531, and the Endangered Species Conservation Act of 1969, 16 U.S.C. 668aa to 668cc–6.

The complaint seeks injunctive and declaratory judgment relief. Plaintiffs seek to permanently enjoin defendants from completing a 4.3 mile segment of Forest Service Road No. 92 in the Greenbrier Ranger District of the Monogahela National Forest. The route of the forest road under consideration is along the ridge of Cheat Mountain and along the westernmost perimeter of an area designated, apparently sometime between 1956 and 1970, by the West Virginia Department of Natural Re-

sources as a black bear habitat area. It is recorded that this black bear habitat area is one of four such areas in the State of West Virginia.

While the stated objective of plaintiffs is to obtain a judgment declaring the road construction in issue unlawful, the practical goal is to compel the United States Forest Service to prepare, circulate and consider an environmental impact statement, further developing the various factors which plaintiffs believe are important to the decision making process incidental to the location of a forest roadway. Plaintiffs thereby urge the preservation of the rugged, pioneer styled, primitive wilderness, and they believe this is conducive to the propagation and preservation of the black bear population in West Virginia.

The defendants are Earl L. Butz, who is sued individually as well as United States Secretary of Agriculture, John McGuire, who is sued individually and as Chief of the United States Forest Service, and Frederick A. Dorrell (Dorrell) who is also sued individually and as supervisor of the Monongahela National Forest. For the purposes of this litigation, no substantial question was raised as to the propriety of the parties defendant before the Court.

The plaintiffs are citizens of West Virginia who live in close proximity to the Monongahela National Forest and the particular area of the disputed Forest Service road connection. No substantial controversy was presented as to the standing of the plaintiffs to challenge the actions of the Secretary of Agriculture and its forest arm, the United States Forest Service.

Plaintiff Lloyd E. Kisner, Jr., lives "on top of Cheat Mountain" and believes that the proposed road "opens up" too much county for exploitation, provides no protection to the forest and disregards future considerations of the forest. Kisner is the owner and operator of a motel-restaurant and engages in bear hunting. Caroline Brady Wilson is another plaintiff who resides in the City of Elkins, a short distance from the area of the proposed roadway and believes that ". . . the area of the . . . forest to be crossed by the proposed road is one of the five remaining black bear breeding areas in the State of West Virginia, which area will undoubtedly be lost for this purpose because of increased human usage; and that her interests in the Monongahela National Forest are aesthetic, ecological and hiking purposes, all of which will be irreparably damaged by the proposed road construction."

Marcus W. Rennix is one of the parties plaintiff and is a professional nurseryman and landscape architect by training and experience as well as education. He states that he is ". . . familiar with the area of the Monongahela National Forest to be crossed by . . . road No. 92 along the top of Cheat Mountain; that his family has resided in Randolph County since 1760 and he has spent all of his life there; that he has been a National Forest Fire Warden for twenty-five years; that from where he lives he can see Cheat Mountain and is familiar with the deer herd in West Virginia; that the deer herd in West Virginia is now being destroyed by 'poachers,' but not on Cheat Mountain because there is access by only one road entrance; that if the proposed road is completed, poaching will increase because poachers can drive straight through an area of the Monongahela National Forest which was previously inaccessible; that the area of the Monongahela National Forest to be crossed by the proposed road now serves as a reservoir for many types of game; and that his interests in the Monongahela National Forest are aesthetic, ecological and for hunting purposes, all of which will be irreparably damaged by the proposed road construction."

Dorothy Lutz is the remaining plaintiff. She is an eighth generation descendant still holding property in Randolph County by land grant from King George III (1760). She and her husband presently own farm property at

Beverly, West Virginia, which is in close proximity to the proposed roadway. She believes the area of the forest that will be traversed by the proposed road is abundant in wilderness qualities and provides a diversified habitat for black bear, deer, birds and other wildlife. Her interests in the National Forest are aesthetic and ecological, and she believes these will be irreparably damaged by the proposed road construction.

By stipulation and agreement of counsel, all issues have been advanced, fully developed and are now matured for the Court's final consideration. All parties have now presented all desired testimony at a plenary hearing held for the purpose.

At the hearing on this matter it was determined, without controversy, that the road construction contract in question was let on April 24, 1972, at a bid cost of approximately $321,600.00, and construction thereon has commenced. The road under the contract is scheduled for completion in the Fall of 1973. Approximately 20% of the road in question was completed at the time of the hearing. The total length of the connecting roadway in question is 4.3 miles. Because of weather and soil conditions, the effective work time for a contractor in the area of the proposed road is limited to about two months of each calendar year. The two months for construction work generally falls, it was said, during the months of August, September and October.

The contested road project is the final link in a Forest Service Road that will total approximately 16 miles in length. The southern terminus of the Forest Service Road No. 92 is located at United States Route 250. The southern segment of this Forest Service Road is approximately 9 miles in length and was built during the 1930's by the Civilian Conservation Corps. From this southern segment of Forest Service Road No. 92, several access roads have been constructed in an eastward direction, downgrade, generally into the Shaver's Fork of Cheat River.

Shaver's Fork of Cheat River is an exciting white water stream, so identified by trout fishermen from many sections of the eastern part of the United States. The West Virginia Department of Natural Resources has successfully promoted "fish for fun" in this particular area of the Monongahela National Forest. The existing southern portion of the Forest Service Road in question and the subsequently connected access roads have made, according to the evidence, the Shaver's Fork of Cheat River abundantly accessible to fishing enthusiasts.

The northern segment of Forest Service Road No. 92 is approximately 3 miles in length and was built several years ago by the Forest Service. The northernmost terminus, according to the testimony and exhibits presented, ties into existing rural roads that lead into secondary and then primary highways in the area.

The contested project before the Court is properly considered as the middle or connecting link of Forest Service Road No. 92. The road will be a permanent road of gravel surface, mostly one lane character with "pullout" areas so that vehicles meeting other vehicles will have an opportunity to pass at given locations without incident.

The proposed roadway when completed, as is the case of the segments now in existence, will be open for the general public, such as hunters, fishermen, sightseers, recreationists, as well as others who now frequent the forest and its many streams. The road is and will also be available for commercial use, in transporting and removing timber sold by the Forest Service from the Monongahela National Forest and for access in the prospecting and development of mineral interests by mineral owners.

It was disclosed during the hearings in this matter that the United States Government does not own the minerals

underlying the portion of the Monongahela National Forest involved in this litigation and the Forest Service is hopeful that by the utilization of permits for commercial use of the roadway they will be able to control and thereby develop a close liaison with mineral owners, as those privately owned forest resources are developed. It is hoped that such cooperation will thereby enable the Forest Service to meaningfully protect their surface resources of this national forest.

It was the considered opinion of witnesses on behalf of the Forest Service that the immediate impact of use on the highway would not be much greater than at present. In other words, the Forest Service witnesses do not believe that the connecting of the two existing segments would increase the present use of the area by an appreciable amount. They acknowledge that there would be some immediate increased use but that the substantial use would occur over an extended period of time. Apparently, from the import of the testimony presented, the Forest Service bases its construction calculations, as to usage, into a period of time divided into 20 year increments.

During the calendar year 1969, Dorrell in his role as Supervisor of the Monongahela National Forest determined, in the routine course of forest management and long term Forest Service road construction, that a study should be undertaken to determine the advisability of completing Forest Service Road No. 92, making the same a through road.

During the Fall of 1970 the Supervisor of the Monongahela National Forest (Dorrell) directed the Forest Ranger of the Greenbrier Ranger District to prepare a "multiple use survey." This evaluation envisioned all forest characteristics and resources, including timber, minerals, surface, outdoor sports, other recreation, watershed and propagation of fish and wildlife. The evaluation centered around the road segment as the same would pass along the Cheat Mountain area of the Monongahela National Forest.

Plaintiffs' Exhibit 1 is the "Multiple Use Survey" from the Forest Ranger.

In compiling and preparing the "Multiple Use Survey" the Ranger for the Greenbrier Ranger District obtained comments from wildlife biologists of the West Virginia Department of Natural Resources.

There exists between the United States Forest Service and the West Virginia Department of Natural Resources a cooperative agreement whereby the West Virginia Department of Natural Resources works closely with the Monongahela National Forest in wildlife management programs. In short, fish and wildlife in national forests are, it is understood, considered to be as much a resource as timber, coal, oil and gas production. It was the position of at least two of the West Virginia Department of Natural Resources wildlife biologists that the road segment in question should not be built because in their opinion it would be a threat to the black bear habitat and black bear population in that area of the Monongahela National Forest. The Director of West Virginia's Department of Natural Resources expressed his opinion in this regard also in a communication with the Supervisor of the Monongahela National Forest.

The Supervisor of the National Forest (Dorrell) testified at the hearing before the Court that after receiving this communication he had at least one and perhaps more conferences with the Director of the Department of Natural Resources concerning that department's interest and concern with the black bear and the area in question.

The well developed "Multiple Use Survey" for the roadway in question presented a candid and clear summary of its objectives and succinctly stated the alternatives in three particulars. It contained the recommendation of the Ranger not to build the road. The Forest Ranger for the Greenbrier District felt that "some multiple use benefits

could still be derived from less intensive management (of the affected area of the Monongahela National Forest) and recognition of the relative isolation needed for black bear breeding would be assured." Other alternatives included constructing the road and placing gates on it and, the alternative finally adopted by the Forest Supervisor, to build the road extension and obtain the multiple use benefits that could be derived from better access and more intensive management of resources available in that area of the forest.

The "Multiple Use Survey" presented a detailed analysis of the various tangible and intangible opportunities and consequences of such a roadway. It not only considered these in a singular sense, namely the 4.3 miles forest road segment, but also viewed the same in totality.

During the course of the testimony presented in this matter it was revealed that the study was completed and furnished to the Monongahela National Forest Supervisor in October or November, 1970.

The report's recommendation not to build the connecting link of Forest Service Road No. 92 was primarily grounded upon the concern of personnel in the Forest Service as well as those in the West Virginia Department of Natural Resources that the use of the road would "endanger the area's potential as a black bear breeding area and that other areas (in the State) suitable for this purpose are very scarce."

The record in this litigation reveals that with the "Multiple Use Survey" in hand the Monongahela National Forest Supervisor (Dorrell) then pursued the normal Forest Service procedures and presented the survey to the Forest Service staff officers for study of the many and varied factors involved in the project. This staff study was accomplished and presented to the Monongahela National Forest Supervisor (Dorrell) sometime during November, 1970. Dorrell's decision to proceed with the construction of the roadway segment was made in December, 1970.

On the threshold issue of whether the roadway in question and its immediate and long range use would affect the immediate black bear habitat, the testimony of Dorrell revealed that as a result of all the imput of information presented, as well as his independent study, it was his opinion, that there was reasonable professional disagreement concerning the impact of the proposed roadway segment in question on the black bear habitat. Apparently, the area of disagreement ranged from the belief that the proposed roadway would be the doom of the black bear habitat to others who felt that it would have some, or even very little, effect.

It would seem to be the consensus of witnesses who testified on behalf of the Forest Service that, based upon their experience, training and education in forest management, the roadway itself would be an insignificant factor as to the black bear population; that there are a variety of other factors that more importantly affect the black bear population and their habitat, for example, large groups of hunters using two-way radios, hunting with large "packs" of bear hounds.

Dorrell testified that in making his decision in December, 1970, he determined that to decide the road construction question solely upon consideration of the black bear habitat would in effect create a dominant or exclusive management plan for the entire Cheat Mountain range; that this was not a fair management plan for the entire region especially in view of the professional disagreement over the impact or effect that the connecting roadway would have on the black bear habitat; that the fair and reasonable management determination of the forest in general would be to employ multiple use management whenever and wherever possible; that the black bear habitat question should not be treated as the principal or dominant issue in the total determination but that it should be

only considered as one of many important factors in considering and determining whether the roadway in question should be constructed.

Although the National Environmental Policy Act of 1969 became effective on January 1, 1970, at the time Dorrell made the decision to construct the road segment in question, Forest Service policy guidelines and regulations had not been put into effect. Agency personnel responsible for complying with the National Environmental Policy Act had not then been advised of the manner or extent to which the Act might apply to Forest Service actions. Dorrell testified that in making his determination in this instance he looked at the Act, as it appears on the statute books, and did not at that time have the benefit of guidelines or policies of his organization. The Forest Service policy guidelines respecting implementation of the National Environmental Policy Act were published in the Federal Register on or about December 11, 1971.

The Monongahela National Forest Supervisor (Dorrell) is and was the Forest Service employee responsible for compliance with the National Environmental Policy Act, to the extent required by the Act, and he did not in this instance prepare, circulate or initiate hearings on or file an environmental impact statement under the Act. He testified convincingly that in December, 1970, it was his understanding, from a reading of the Act, and consultation with others, that an impact statement was required by the Act only when the contemplated action would have "major and significant" adverse effects on the environment; that it was his judgment at the time of his decision that the connecting roadway would not have a major or significant adverse effect on the environment.

Other than Dorrell's testimony, and that of other Monongahela National Forest staff members, no statement or explanation of reasons was introduced into the record. In other words, other than the testimony now before the Court, with exhibits, the Court record does not have an administrative record upon which to base a judicial review.

After the Forest Service policy guidelines were published on or about December 11, 1971, the Monongahela National Forest Supervisor did not make a redetermination whether or not the building of this road segment was such action as would require an environmental impact statement under the National Environmental Policy Act. Upon the completion of the engineering studies by the Monongahela National Forest Service Engineer with regard to route, location and nature of the road segment, the project was approved for construction, and the contract let during the month of December, 1971. Testimony before the Court indicates that there was no public notice of the matters under consideration until the routine published notice seeking bids was published in accord with existing government procedures in matters of this nature.

The Forest Service policy guidelines which are now in force, and have been in force since approximately December 11, 1971, provide that when a proposed action of the Forest Service is "highly controversial" an environmental impact statement should be filed. There is no apparent definition therein as to how such a determination of "highly controversial" is to be made, or how the public is to be informed of the proposed action in order for the Forest Service officer responsible for making such determination can decide whether the action is actually "highly controversial."

The expressions made by officers of the West Virginia Department of Natural Resources which have been made a part of the record here, the testimony and exhibits presented on behalf of plaintiffs, including affidavits filed by plaintiffs at the time of the institution of their action, comprise the total apparent opposition to the road construction. Supervisor Dorrell testified that he was

not aware that the road construction was or would be "highly controversial" at the time he made his determination.

The "highly controversial" factor is an obvious desire by policy makers of the Forest Service to include what may be an additional, extra legislative factor into programs, projects and proposed actions of their agency, over and above those required by the National Environmental Policy Act; or is an observation that a "highly controversial" project may or could be a "major" federal action or have a significant effect on the environment.

Here, when the road construction decision gained public attention, controversy arose concerning the advisability of the project. This opposition has localized itself into serious concern over the threat to the black bear habitat, the black bear breeding areas and the black bear population in the vicinity of the area through which the road will be located.

The record of the hearing before the Court reveals that the Council on Environmental Quality issued guidelines to all federal agencies on April 23, 1971, and in part provided that ". . . if there is potential that the environment may be significantly affected, the (environmental impart) statement is to be prepared."

Before pursuing the elusive question of whether an impact statement is required in this matter, the Court is persuaded that the plenary hearing here at least developed "post hoc" reasons and rationalizations for the Supervisor's decision, and while they do not constitute the "whole record" compiled by an agency for a basis of review as required by the Administrative Procedures Act, 5 U.S.C. § 706, the testimony before the Court was thorough, subject to intensive direct inquiry as well as able and exhaustive cross-examination. Thus the evidence here effectively diminishes the inherent evils associated with resolution of issues via litigation affidavits alone, which have traditionally been found to be an inadequate basis for review. Bur-

lington Truck Lines v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L. Ed.2d 207 (1962); SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

". . . [I]t may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard.

The court may require the administrative officials who participated in the decision to give testimony explaining their action. Of course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 1004–1005, 85 L.Ed. 1429 (1941). And where there are administrative findings that were made at the same time as the decision, as was the case in *Morgan*, there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves. See Shaughnessy v. Accardi, 349 U.S. 280, 75 S. Ct. 746, 99 L.Ed. 1074 (1955)." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1970).

The net result of the advancement of this litigation to final hearing and the taking of all available testimony was to achieve "effective judicial review . . . by examining the decisionmakers themselves."

Dorrell, while under examination as the decision maker, candidly stated his position as it existed during the late months of 1970, when his determination, now under review, was made. He testified under direct examination:

"We viewed the National Forest as a whole in terms of the type of management, particularly the area which

would be substantially isolated or primitive and the balance that it would have on the total use of the National Forest.

We looked very carefully at the nature of the black bear theory and also the inconsistencies of it with the other activities and uses of this part of the National Forest in West Virginia."

With regard to whether or not the connecting segment of roadway in question was a "major federal action," Dorrell stated, "I didn't view the completion of a road project that had been in existence and used over 30 years as a major federal action."

He considered in his analysis of the total question presented to him that the 4.3 miles of connecting Forest Service roadway was typical, average forest type road and in an area where such roads already existed.

With regard to the effect or impact of this project on the environment Supervisor Dorrell said:

". . . [I] also think that it is still subject to judgment. I didn't feel that this was controversial. At the time, it certainly wasn't. And whether it is now, I believe that is a matter of judgment.

We had no, with the exception of the reports that we received from the Department of Natural Resources, we had no contradictions or inputs from anybody else indicating, you know, that this was a controversial project and we have had some experience with controversies in the Monongahela in the last few years. So, I think we are able to make that judgment pretty well."

After testifying extensively as to the particulars and details that comprised the sum total of his decision to authorize the construction of the controverted segment of Forest Service Road, Dorrell summarized the conclusions which led to his affirmative decision.

"First, again; it was a completion of the planned transportation system in this area for the use of the public in this part of the National Forest.

It was a facility which would be helpful in the management of the National Forest and in this part of it under the multiple use concept and it would provide access for recreation, access for timber management and access for protection and development of this part of the forest.

We also viewed the wildlife management complications because of this interest in the black bear and felt that this was not of significant or substantial enough and conclusive enough from an aspect to justify not developing this part of the National Forest transportation system.

We viewed the complications, for example, that the construction of this road would have on the immediate environment in terms of the soil and watershed. We directed our engineers and staff to be sure that all of the necessary safeguards that could be employed these days within our ability, were put into effect."

Within the factual reference developed by the testimony, it is now incumbent, to reach the ultimate resolution of the points of law raised, to preliminarily ascertain the overall, broad general principles of the National Environmental Policy Act of 1969. Congress stated the purpose of the Act in 42 U.S.C. § 4321.

". . . To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; . . ."

The thrust of plaintiffs' theory of litigation is aimed toward the prevention or elimination of damage to the environment but also is directed toward the encouragement of the productive and enjoyable harmony between man and his

environment. The obvious goals of the defendants also fit these broad policy purposes. Indeed, it is virtually uncontested that the defendants by their management of the National Forest also are seeking to encourage productive and enjoyable harmony between man and his environment on a broad range. Also, within the comprehensiveness of their expertise, the members of the Forest Service staff also are pursuing every endeavor to prevent and eliminate damage to the environment. The third statutory purpose is inherent in the testimony, as well as from other related factors that became apparent during the plenary hearing before the Court, namely that the Forest Service is endeavoring to enrich the understanding of all the ecological systems and the natural resources of the Monongahela National Forest. These goals are being sought after with a wide-ranging, multiple use effort and are being achieved in a measure at least in conjunction with other agencies, notably in this case with the West Virginia Department of Natural Resources. All wildlife in the Monongahela National Forest is considered, in a literal, practical sense, to be a natural resource of the forest.

The next logical step in analysis of the issues presented compels a reflection upon the stated Congressional policies and goals. 42 U.S.C.A. § 4331(a) identifies these policies, and as related to this litigation, the pertinent portion of section (a) is as follows:

"(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly . . . resource exploitation, . . . and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures,

. . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."

The important segments of section 4331(b) as related to the issues in this litigation are as follows:

"(b) In order to carry out the policy . . . it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

\* \* \* \* \* \*

(3) attain the widest range of beneficial uses of the environment without degradation, . . . or other undesirable and unintended consequences;

(4) preserve important . . . natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources . . ."

Plaintiffs' litigation is directed toward (1) the prevention of "undesirable and unintended consequences" with regard to the uses of the forest, all as is identified in Congressional policy of subparagraph (b)(3) above quoted, and (2) the preservation of the "natural aspects of our national heritage" which in this instance is identified with the black bear population, the symbol of rugged individualism in a terrain that is mountainous and heavily timbered and largely unpopulated. Because of his rugged individualism, the black bear has been designated as the State animal for the

State of West Virginia. The plaintiffs also identify with the provisions of subparagraph (b)(6) above referred to, and seek to "enhance the quality of renewable resources. . . ."

On the other hand, a critical reasoning of the position advanced by defendants assures that defendants are also seeking to "attain the highest range of beneficial uses of the environment" (National Forest in this instance) without "undesirable or unintended consequences"; that they too are interested in preserving the "natural aspects of our national heritage," namely, the black bear, and believe that the connecting road segment in question is "insignificant" in this regard. As a parallel consideration, they too are interested in the enhancement of the bear as a renewable forest resource.

Perhaps the provisions of subparagraph (b)(5) however are more definitive of the total position of the Forest Service, more so than any one of the other itemized Congressional considerations of national policy. Subparagraph (b)(5) instructs us that it is a Congressional policy and goal for the federal government to use all practical means to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; . . ."

The procedural requirements assuring the carrying forward of the broad purposes, policies and goals of the Act are fully reflected in 42 U.S.C. § 4332, which in pertinent part, as to this litigation, is as follows:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the . . . public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have a[n] impact on man's environment;

(B) identify and develop methods and procedures, . . . which will insure that presently unquantified environmental amenities· and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved . . . ."

One of the more recent evaluations of these statutes, as applied to the issues here, is stated in Scherr v. Volpe, 466 F.2d 1027 (7th Cir. 1972), 4 E.R.C. 1435, affirming the district court [336 F. Supp. 886 (D.C.W.D.Wis.1971)], as to the granting of a preliminary injunction.

In *Scherr* the 7th Circuit commented:

"The broad substantive policies and objectives of NEPA are contained in § 101 thereof. There the Congress ex-

pressed its basic goal that the federal government should strive for the protection of environmental values. Environmental protection was not established as an exclusive goal, rather the Congress restructured priorities in such a way that the ecological consequences of a federal action must now be given consideration . . .
[4 E.R.C. 1437.]

The method by which the national goals would be achieved was left undefined in Section 101. However, Congress did not simply provide us with a promise incapable of realization. Important and much less flexible procedural requirements designed to insure that federal officials meet the sweeping Congressional commitment to the environment are contained in Section 102 of NEPA. . . .
[4 E.R.C. 1437.]

Through the enactment of these [Section 102] procedural requirements the Congress has not only permitted but has compelled the responsible federal agencies to take environmental values into account. See Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com'n, [146 U.S.App. D.C. 33,] 449 F.2d 1109, 1112 [2 ERC 1779] (D.C. Cir. 1971). Not only must the environmental consequences of a particular action be considered, but Section 102 requires also that these consequences be weighed and balanced against other considerations, such as financial or social, which may be involved.

The environmental impact statement required by Section 102 is designed to insure that this balancing analysis is given its fullest effect. *Pro forma* compliance with the substantive guidelines of Section 101 simply will not suffice. Section 102 of NEPA provides that its procedures be implemented and carried out 'to the fullest extent possible.' Thus the somewhat flexible and general guidelines articulated in Section 101 are not to be found in its companion Section 102. Absent a conflict of statutory authority (footnote, see § 104 of NEPA, 42 U.S.C. § 4334), the responsible federal officials must give full consideration to the environmental consequences of a major federal action significantly affecting the environment. The procedural steps outlined in Section 102 apply notwithstanding considerations of administrative difficulty, delay or economic cost. Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com'n, 146 U.S.App. D.C. 33, 449 F.2d 1109, 1115 [2 ERC 1779] (1971)." [4 ERC 1438.]

42 U.S.C. § 4334 (§ 104 of NEPA), footnoted in the *Scherr* decision, provides:

"Nothing in section 4332 (§ 102 of NEPA) or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency."

In *Scherr*, the litigation swirled around a federal aid highway project designed to convert 12 miles of a conventional two-lane highway into a four-lane freeway, requiring the acquisition of right-of-way that allegedly threatened animal habitat, aesthetic values, as well as air and water qualified for land and lake areas. The state highway officials did not maintain a record, as to the basis of their decision, but insisted that they had the untrammelled discretion to determine whether a particular project is "major" and whether it is a project "significantly affecting the quality of the human environment." Therefore, having made the basic determination the defendants concluded that their decision not to file an impact statement should not be subject to injunctive action unless it was shown that the determination was arbitrary or capricious. The district court rejected the contention and grant-

ed a preliminary injunction, reasoning that although the officials must decide in the first instance whether an impact statement is required, their decision is subject to broad judicial review.

In commenting on this aspect of *Scherr*, the appellate court noted:

". . . Implicit in the judge's ruling is the recognition that not all federal actions will require the preparation of an environmental statement. Some actions may be so small and so tenuously related to the environment that it cannot be fairly said that NEPA applies. The judge however believed that when the agency's failure is challenged, it is the responsibility of the judiciary to construe the statutory standards and thereby decide whether the agency violated the Congressional command."

The court further noted:

". . . the record is absolutely barren of any indication of the basis upon which the agency made its determination that no impact statement was required. This is not to suggest that in every case arising under this section that the responsible federal agency must articulate in writing the reasons why no environmental statement was filed. Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 417, 91 S.Ct. 814, 28 L.Ed.2d 136 [1 ERC 1685] (1971)."

"Absent the benefit of an administrative record, we must confine ourselves to the language of the statute itself and to the applicable administrative memoranda issued by the United States Department of Transportation."

Relying upon the administrative memoranda of the United States Department of Transportation, the court noted that the matters in controversy were obviously, as defined by the agency, major federal action, and from the record the project was one that would significantly affect the quality of human environment. In this latter consideration the appellate court commented:

"Although these findings are earnestly disputed by the defendants, we are satisfied on this record that the Highway 16 project is one that has a significant impact on the quality of the human environment in that area. This is not to say that there will be irreparable damage to the environment nor that the environmental considerations outweigh the other considerations which attend the planning and construction of a federal highway. We decide only that the project will have a significant impact on the environment and that the consequences to the environment should, as mandated by NEPA, receive the proper consideration by the highway officials involved." (4 ERC 1439).

A casual view of the relatively undeveloped nature of the litigation in Scherr v. Volpe demonstrates that it is significantly different from the matured position of the parties before this Court. Here the litigation apparently is considerably beyond the scope of *Scherr*, on the preliminary injunction issue in the district court, the subject matter on appeal. Here the litigation is complete, affording the opportunity for a broad, as well as a full and effective, judicial review of the "mental processes" of the administrative decision makers.

The Court is unable to envision, and indeed there has been no suggestion by counsel for any of the parties, that any additional testimony or further evidence could be injected into this litigation.

In *Scherr* the court noted the limitation of its position, stating that

". . . this is not to say that there will be irreparable damage to the environment nor that the environmental considerations outweigh the other considerations which attend the planning and construction of a federal highway. We decide only that the project will have a significant impact on the environment and that the consequences to the environment should, as mandated by NEPA, receive the

proper consideration by the highway officials involved."

If the Forest Supervisor here was mandated to file an impact statement, then the statutory statement by the Supervisor of the Monongahela National Forest should have been, under the provisions of 42 U.S.C. § 4332(C), " . . . made available to the President, the Council on Environmental Quality and to the public. . . . "

If on the other hand the complained of federal action is other than major; or, if a "major federal action," that the effect on the quality of the human environment is other than significant, then the Supervisor of the Monongahela National Forest acted properly.

Here our inquiry turns to a full evaluation of the mental processes of the administrative decision makers as to the construction of this 4.3 miles of forest roadway.

█ The total record before the Court fails to demonstrate, in fact or law, that the rather small, in length, unfinished portion of the roadway in question, begun over 30 years ago, in its initial construction process, and part of an overall roadway transportation scheme of the National Forest and which is but a gravel, one-lane typical forest road, has or will have a significantly adverse impact on the natural ecology, and does not appear to be inconsistent with the National Environmental Policy Act's goals and purposes. It does not appear that the completion of this road segment, of itself, will have dramatic initial impact on the area in question, and the degree of impact, to be generated in the future, will come from the multiple use proposals of the National Forest. It was a valid determination of the Forest Service to further its overall transportation plan so as to give to its management and operation programs further multiple use options, as long as the multiple use options are within the statutory and policy guidelines as laid down by the enactments of Congress.

Other than the bear habitat-hunting-population issue it does not appear from the record in this case that the roadway would have a serious impact on the natural ecology of other wild animals, excepting the deer herd. It was said that the deer herd is subject to widespread illegal hunting by poachers. This is an area of interest to law enforcement agencies rather than ecology, as that issue was developed in this litigation.

Also, the evidence before the Court does not indicate that the nature and type of roadway contemplated, and under construction, would strip the forest lands of timber that would create an attendant erosion problem, or that the roadway in question would violate the sanctity of the forest by increasing the levels of water pollution, air pollution, or noise.

The nature and extent of the roadway in question as well as the planned utilization of it does not indicate that there would be an impingement upon the aesthetic natural beauty and recreational value of the area. Rather, the Court is impressed that the multiple use of the area, brought about by the completion of the roadway in question, will vastly improve the opportunity of the public to witness the natural beauty of the Cheat Mountain area and will thoroughly and wholesomely complement the recreational values of hunting, fishing and hiking in the area.

From the record before the Court, it must be concluded that if the determination for the construction of this typical forest type road was based upon the sole consideration of the bear habitat, and we must realize that this is a professionally controverted subject among wildlife biologists, the Supervisor of the National Forest would have permitted one issue to dominate the question presented. The record demonstrates that other equally important factors were apparent, were deserving and were taken into account and evaluated in the decision making process.

Also of considerable importance, in seeking the answer to the question of the effect of this project on the environment, "Respondents' Exhibit 1" demonstrates that the Monongahela National Forest, east of the area in question, and encompassing the area designated as black bear habitat, is honeycombed with various types of transportation systems, including many roadways, some of which lead to "fish and fun" areas along the Shaver's Fork of Cheat River; hiking trails that are employed by persons who are given to that particular recreation; and pipelines for the transportation of natural gas from the gas fields of the southwest through West Virginia into the large metropolitan areas to the east.

When studying the future impact on the environment by this 4.3 mile segment of forest road, the Court must be mindful that existing transportation ways, other than the roadway in issue, now bring people into this so-called black bear habitat area.

Perhaps the honeycomb of roadways, walkways and pipeline rights of way that now traverse this area of the Monongahela National Forest and the black bear habitat area indicate that if black bear existed and thrived in this black bear habitat area, immediately prior to the decision of the Supervisor of the Forest in December, 1971, as we must presume, then the construction of this 4.3 mile segment of forest road will not significantly trouble the black bear population in the future. It is also important, the Court believes, to recall from this record that there is in the Monongahela National Forest a total of some seven or eight hundred miles of roadway, used for a great number of years by the public. These forest type roadways, and their use, have not adversely affected the forest environment.

Turning next to considering whether the road project in question is a "major federal action" under the National Environmental Policy Act of 1969, thereby requiring the Supervisor of the Monon-

gahela National Forest, as the responsible official, to file the environmental impact statement, the Court must also be mindful that the segment of road in question is the completion of a particular road project that has been in existence and extensively used by the public for as much as 30 years. The connecting link will not, according to the most dependable testimony presented, contribute to an immediate, commanding or powerful increase in the usage of either the existing or connecting roadway, or the immediate area of the Monongahela National Forest.

In contemplating upon 42 U.S.C. § 4332(C), especially the language prefacing the requirements of the impact statement, Congress said:

" . . . in every recommendation or report on proposals for legislation and other major Federal actions. . . . "

■ Congress in some instances apparently equates proposals for national legislation with "other major Federal actions." Here, the connecting link of a forest roadway, the use of the roadway as envisioned, could not under this standard reach the proportions of "major Federal actions."

Somewhat similar issues to those presented here were faced and answered by the Fourth Circuit in Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972). On facts however there is a wide difference. There a multilane interstate (with up to 14 lanes) highway complex was proposed through parkland that enjoyed its own special type of Congressionally protected status. There was presented a serious question of balancing interests of essential highway construction, with its definite Congressional mandates as to a course of procedure, and the disruption and involvement of an established community of thousands of persons. Factually, the matters here do not present such high intensity of human involvement as was apparent in *Arlington Coalition*. Neither is there present here the

additional statutory deterrents such as were there present to protect parkland such as was to be used in the interstate highway construction through the northern Virginia metropolitan area.

As earlier noted, it is now an administrative position that "highly controversial" projects are considered either major federal actions or projects that carry a significant impact on the environment. Measuring this administrative test to the issues before the Court, the Court is in agreement with the testimony of Dorrell, who as Forest Supervisor, said (1) he believed that such determination, as then under consideration, was a matter of subjective judgment; (2) that at the time of his decision he did not feel the subject matter was controversial; and (3) "with the exception of the reports that we received from the Department of Natural Resources, we had no contraindications or inputs from anyone else indicating, you know, that this was a controversial project. . . ."

From these observations it does not appear that this was then a "highly controversial" project, such as would be the case of a project incidental to the disruption of an established community or even a planned development.

For the reasons discussed and enumerated, it is the determination of the Court that at the time the Monongahela National Forest Supervisor Dorrell decided in December, 1970, that the road segment of approximately 4.3 miles should be built, the decision was made following and based upon conferences with the members of his Monongahela National Forest staff who together with Dorrell took into account all aspects of the project, that have now been fully and completely aired in the trial of this matter before this Court; that the determination of Dorrell, as Supervisor of the Monongahela National Forest, that this forest road project was not major federal action, was indeed a correct evaluation and his determination that the project did not significantly affect the quality of the environment was also cor-

rect; that the decision making process of the said Supervisor was not, in any sense, arbitrary or capricious but was wholly proper and circumspect; that because of the entirety of the circumstances then considered and now judicially reviewed, the Court concludes that the Supervisor in this instance acted correctly by proceeding with the project without first filing an environmental impact statement under section 102 of the National Environmental Policy Act of 1969 [42 U.S.C. § 4332(C)].

Throughout the trial, it was consistently and earnestly maintained by defendants that the road segment in question, which would connect the two existing roadways now in use, was the appropriate development and use of the total National Forest for the many uses to which its resources are naturally adaptable. This quite naturally, and the Court believes properly, leads us to the integration of principles found in the Multiple Use Act, 16 U.S.C. §§ 528–531. Section 1 of the Multiple Use Act (16 U.S.C. § 528) in pertinent part declares the policy of Congress to be:

" . . . the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. . . ."

Section 2 of the Multiple Use Act (16 U.S.C. § 529) authorizes the Secretary of Agriculture

" . . . to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom. In the administration of the national forests due consideration shall be given to the relative values of the various resources in particular areas. . . .".

Section 4(a)(16 U.S.C. § 531) of the Multiple Use Act defines the term "multiple use" as

"The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet

the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output."

Other statutes governing the management and operation of National Forest lands signify a system and interdisciplinary approach that serves to integrate the natural sciences and the environmental arts. Typical of these acts are 16 U.S.C. § 532, where Congress declares the construction and maintenance of an adequate system of roads and trails within and near the National Forest lands, administered by the Forest Service, as being essential to the increasing demands for timber, recreation and other uses of the forest lands, and that such transportation system is essential for the Secretary of Agriculture to provide for intensive use, protection, development and management of forest lands under principles of multiple use and other programs; and 16 U.S.C. § 535, where the Secretary of Agriculture is particularly authorized to provide for the acquisition, construction, maintenance of "forest development roads within and near the national forests . . ." (as is here accomplished), " . . . locations and according to specifications which will permit maximum economy in harvesting timber . . . and at the same time meet the requirements for protection, development, and management [of forest lands] . . . and for utilization of the other resources [of forest lands]. . . ."

Another contention suggested by defendants is that even though no environmental impact statement was filed under the National Environmental Policy Act, they maintain that the environmental considerations were expressly taken into account during the formulation of the Greenbrier Ranger's report and the subsequent staff interdisciplinary review. Without attaching the badge of validity to this contention, it is sufficient to find, because of the evidentiary record before the Court, that this contention is now moot and it is unnecessary for the Court to take any further action on the same.

It is commendable that individuals have an interest in the environment and in the maintenance of our traditional way of life, and, because of these salutory reasons, are agreeable to bringing civil actions challenging administrative acts of departments and agencies of the federal government. Congress itself " . . . recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." 42 U.S.C. § 4331(C).

In a recent article in The Practical Lawyer, Vol. 18, No. 5, May 1972, at page 85, entitled "The National Environmental Policy Act," it is said

" . . . [N]EPA is not a toothless tiger that can be ignored whenever it fits the convenience of federal agencies. The citizen suit provides an extraordinarily flexible and effective enforcement technique, at least against administrative agencies. See the discussion of the citizen suit in chapter 5 of the 1971 Annual Report of the Council on Environmental Quality, at 155–70.

The courts have been vigilant—perhaps even too vigilant—in implementing the NEPA requirements. In the process, the courts have broadened the citizen's right to bring suit and the scope of court review of administrative actions."

The long range benefits of the National Environmental Policy Act are discussed in considerable detail. One of the emerging benefits, as has perhaps been demonstrated in this litigation, is expressed at page 84 where the author reports:

"Third, NEPA forces agencies to articulate their decisions and the bases of their decisions. They must not only invite and listen to outside comments, but they must in practice respond to such comments.

If it is asserted that a certain environmental damage is threatened by a given project, the environmental impact statement cannot safely ignore the question. It must either explain why the agency discounts the threat or why the benefits of the proposed project are believed to outweigh the dangers. The requirement that agencies consider and evidence their consideration of outside comment is likely to result in more thoughtful and informed decision-making."

Finally, as we continue to live in a world that slowly but certainly shrinks around us, with the surge of people surely and rapidly reaching back into hitherto untouched lands, leaving the mark of civilization upon wilderness areas, we find statutory ways to protect somewhat the forest and its wildlife, including the black bear of the National Forests, not only in West Virginia but of the nation. One particular legislative aid is in the form of the Endangered Species of Fish and Wildlife Act, 16 U. S.C. §§ 668aa to 668cc–6.

With the certain retreat of our forest frontiers and its robust way of life, it is necessary to become acquainted with the statutes that permit us to employ the resources of the land in a beneficial and salutory way, all the while accepting and organizing the progress of civilization, so as to preserve for our civilization the vigorous heritage and tradition of our noble past.

The matters set forth herein are the Court's findings of fact and conclusions of law and upon the same an order shall be prepared denying the relief sought and dismissing the cause of action.