SHAUGHNESSY, DISTRICT DIRECTOR, IMMI-
GRATION AND NATURALIZATION SERVICE,
*v.* UNITED STATES EX REL. ACCARDI.

No. 616.  Argued April 22, 1955.—Decided May 23, 1955.

*Marvin E. Frankel* argued the cause for petitioner.
With him on the brief were *Solicitor General Soboloff,*

*Assistant Attorney General Olney, Beatrice Rosenberg* and *J. F. Bishop*.

*Jack Wasserman* argued the cause and filed a brief for respondent.

MR. JUSTICE CLARK delivered the opinion of the Court.

We are called upon in this case to remove ambiguities from a previous opinion which, while clear enough to the trial court, appears to have conveyed a triplicity of meaning to the Court of Appeals. A year ago Accardi was here contesting the dismissal of his habeas corpus petition in which he attacked the refusal of the Board of Immigration Appeals to grant his application for suspension of deportation. *Accardi* v. *Shaughnessy,* 347 U. S. 260 (1954). The sole foundation of his claim was that "the Attorney General [is doing] precisely what the regulations forbid him to do: dictating the Board's decision." * 347 U. S. 260, at 267. We remanded the petition to the trial court for a hearing on the question of "the Board's alleged *failure to exercise* its own discretion, contrary to existing valid regulations." It was alleged on information and belief that the Attorney General had prepared prior to the Board's decision "a list of one hundred individuals whose deportation he sought . . ." as "unsavory characters"; that Accardi's name was among the group; and that the "list . . . was circulated by the Department of Justice among all of its employees connected with the Immigration Service and the Board of Immigration Appeals" with the result that "since that time it has been impossible for [Accardi] to secure fair consideration of his

---

*Mr. Justice Jackson, dissenting, joined issue thus:

"We do not think that [the] validity [of the Board's order] can be impeached by showing that [the Attorney General] overinfluenced members of his own staff whose opinion in any event would be only advisory." 347 U. S., at 270.

case." We concluded that, if Accardi could prove that the Board had not exercised its own discretion in the matter, he should receive "a new hearing before the Board without the burden of previous proscription by the list."

On the remand, the District Court, after a full hearing, found that the Board members "reached their individual and collective decision on the merits, free from any dictation or suggestion . . ." and again dismissed the writ. The Court of Appeals reversed, one judge dissenting, 219 F. 2d 77. The opinion of the court based its conclusion on the ground that the "Attorney General's statements [had] *unconsciously* influence[d] the Board members so that they felt obliged not to exercise their discretion and, without doing so, to decide against Accardi." The chief judge, concurring in the result, thought that our prior opinion merely required Accardi to prove "that there was a list as alleged, that he was on it, and that this fact was known to the Board." The dissenting judge, on the other hand, read our opinion as meaning "no more . . . than that [Accardi's] allegations sufficiently charged 'dictation' by the Attorney General," entitling Accardi to a hearing on the question of "whether the Board's denial of discretionary relief represented its own untrammelled decision or one dictated by the Attorney General." P. 90. He concluded that the finding of the trial judge was not clearly erroneous. We agree with the dissenting judge both as to the interpretation of our prior opinion and its application to the facts of this case.

The opinion of the court recognized that, before Accardi was entitled to another Board hearing, he had to prove that a majority of the Board not only knew of the "list" but were affected by it. However, the opinion concluded that the Board's position that its judgment had not been affected by "the list" was incredible. We find nothing

incredible in the uncontradicted testimony produced before the trial judge through a number of witnesses including the Board members. The record shows that in fact there was no list, as such, and hence that one could not have been circulated among the members of the Board; that the fanfare of publicity complained of was in connection with the Attorney General's "deportation program"; that this program was never publicly related to Accardi until after the Board's decision; that only one Board member knew Accardi was covered by the program, while two others and the Chairman never had such knowledge until after their decision; that the fifth member asserted that he "may have known [of Accardi's inclusion in the program] but . . . couldn't say"; and that no person in the Department of Justice ever directly or indirectly approached any Board member as to the matter. It seems to us that the record fully supports the District Court's conclusion that the Board's decision represented the free and undictated decision of each member. Among the eight witnesses who gave testimony concerning the matter, was the Attorney General. He testified that there was no list; that his investigation "indicated that [Accardi] was a racketeer and that is the reason [he] moved to deport him"; that he "never at any time discussed this matter with any member of the [Board]." In the face of such evidence, we do not believe that speculation on the effect of subconscious psychological pressures provides sufficient justification for rejecting the District Court's finding as clearly erroneous.

Accardi emphasizes the trial court's finding that the Board had notice of the program and of his inclusion therein. This "notice," at most, was given only to the calendar clerk of the Board so that the hearing of certain cases might be expedited. The testimony that it was not furnished to members of the Board or the Chairman is undisputed.

We believe that Accardi has had the hearing required by our previous opinion and that he has failed to prove his case.

Accordingly, the judgment of the Court of Appeals is reversed and that of the District Court affirmed.

*Reversed and remanded.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE FRANK-FURTER joins, dissenting.

There is disagreement here as there was in the Court of Appeals as to precisely what was meant by our former opinion and holding in this case. *Accardi* v. *Shaughnessy,* 347 U. S. 260. This is not surprising in view of ambiguity of language at its best. The Court gives our former opinion a different and in some respects a narrower meaning than I would. I think the Court's interpretation deprives Accardi of a right which I thought our first opinion guaranteed him as far as possible under existing law—an opportunity to have his rights determined by a tribunal which had not already made up its mind based on anonymous information. Consideration of this basic issue requires a more extensive reference to the record in this and the prior case than the Court has found it necessary to give. Accardi's rights cannot be fairly determined on broad legal generalizations or by merely interpreting our former opinion. If that opinion means no more than the Court indicates then Accardi's right to have suspension of his deportation determined without prejudgment by the Attorney General has never been passed on.

Accardi, born in Italy, came to this country in 1932, when he was 21 years old. He entered the United States

from Canada, intending to remain here permanently. But he had no immigration visa. Under the law this made him a deportable alien. Proceedings to deport him were begun in 1947. He married in 1949 and has one child. His wife and child depend on him for support. Because of his original illegal entry, Accardi was ordered deported.

The basis of this controversy is not the original order of deportation but is Accardi's application for suspension of that order under § 19 (c) of the Immigration Act of 1917.[1] That section provides that under certain circumstances the Attorney General "may" suspend deportation of an alien upon proof that he has had good moral character for the preceding five years. The Act does not require the Attorney General to hold hearings or make findings in suspension cases. But regulations properly promulgated by the Attorney General do provide for hearings, and as we held in the prior *Accardi* case those regulations have the effect of law. In other words, our holding was that the Attorney General can no more deny the suspension without hearings prescribed by the regulations than he could if such hearings had been prescribed by Congress itself. And as we explained in our prior opinion, the law through the regulations now provides for aliens like Accardi to obtain "decisions at three separate administrative levels below the Attorney General—hearing officer, Commissioner, and the Board of Immigration Appeals." 347 U. S., at 266. The Board is appointed by the Attorney General and can be removed by him whenever he pleases.

The habeas corpus petition considered in this case and the prior one alleged that the deportation order and the order denying favorable discretionary relief were both null and void, violated due process and should be set

---

[1] 62 Stat. 1206, 8 U. S. C. § 155 (c).

aside. The two chief grounds alleged were: (1) The decision to deny favorable discretionary relief to Accardi "was pre-judged by the Attorney General on October 2, 1952," which was six months before the Board of Immigration Appeals finally acted on Accardi's application for suspension; (2) The Attorney General had so widely publicized and circulated statements about his plan to deport Accardi that it was impossible for the Attorney General's subordinates to grant fair consideration to Accardi's application for suspension of deportation. An exhibit attached to the petition showed that the Attorney General on October 2, 1952, publicized that "the Justice Department hopes to strip citizenship rights from 100 foreign-born racketeers and deport them" and that Accardi was one of these alleged racketeers. Other exhibits showed that after the Board of Immigration Appeals decision against Accardi in April, 1953, it was announced by the Department of Justice that the Board's action was taken "under the current denaturalization and deportation program of Attorney General Brownell against top racketeers and subversives." The District Court in the original proceedings refused to permit Accardi to offer evidence to prove that the Attorney General had prejudged his case and that the circumstances were such that the Attorney General's subordinates could not give a fair trial. The District Court then summarily dismissed the case and the Court of Appeals, one judge dissenting, affirmed. 206 F. 2d 897. It was that case we reversed in our prior opinion the meaning of which is now in controversy.

When the case reached us we said in part as follows:

"The petition alleges that the Attorney General included the name of petitioner in a confidential list of 'unsavory characters' whom he wanted deported; public announcements clearly revealed that the Attorney General did not regard the listing as a mere

preliminary to investigation and deportation; to the contrary, those listed were persons whom the Attorney General 'planned to deport.' And, it is alleged, this intention was made quite clear to the Board when the list was circulated among its members. In fact, the Assistant District Attorney characterized it as the 'Attorney General's proscribed list of alien deportees.' To be sure, the petition does not allege that the 'Attorney General ordered the Board to deny discretionary relief to the listed aliens.' It would be naive to expect such a heavy-handed way of doing things." 347 U. S., at 267.

Pointing out that "the allegations are quite sufficient" we went on to say that

"If petitioner can prove the allegation, he should receive a new hearing before the Board without the burden of previous proscription by the list. After the recall or cancellation of the list, the Board must rule out any consideration thereof and in arriving at its decision exercise its own independent discretion, after a fair hearing, which is nothing more than what the regulations accord petitioner as a right. Of course, he may be unable to prove his allegation before the District Court; but he is entitled to the opportunity to try." *Id.*, at 268.

I think that petitioner proved beyond all peradventure that the Attorney General did "prejudge" Accardi's case as alleged. Under our former opinion this was enough to justify relief. But this crucial question was not passed on at all by the District Court in this case. It went on the theory that we held that petitioner was entitled to relief only if he could establish that the Board of Immigration Appeals felt itself "dictated to" by the Attorney General so that it could not give a recommendation based on its own discretion. In my view this was an unwar-

ranted narrowing of the issues raised. But the Court today seems to accept this as the full scope of our prior holding. Given that narrow scope, our holding fell far short of deciding the issues which were actually presented and were due to be decided if, as we said, Accardi was entitled to "a fair hearing, which is nothing more than what the regulation accords petitioner as a right."

In the final analysis under both statute and regulations the discretion to be exercised is that of the Attorney General. Due to the regulations, however, that discretion can no longer be exercised arbitrarily or without hearings. A fair hearing by an impartial board has been established as a prerequisite to final exercise of discretion by the Attorney General. Failure to await these required hearings and findings before deciding to deport is therefore a violation of the very regulations the Attorney General has prescribed under authority of law. That the suspension of deportation of Accardi was prejudged long before the Board of Immigration Appeals made its decision is established by the undisputed testimony of Hon. James P. McGranery who was the Attorney General on October 2, 1952. He testified that he did have a planned program at that time for the deportation of selected aliens. Shortly thereafter he gave out a statement that the arrest of a certain named alien "was another step in his denaturalization and deportation program aimed at ridding the Nation of undesirable aliens engaged in racketeering and other criminal activities." The Attorney General testified that this statement accurately reflected his program. He also testified that "Joseph Accardi's case was one of the earliest cases submitted, and his case was already on appeal at the time . . . . But my investigation and the record of Accardi proved him, to my satisfaction, to be a racketeer. That is why I put him on there." In testifying about the beginning of his deportation program, the Attorney General said, "I had a conference very early in my adminis-

tration with John Edgar Hoover. I asked him to prepare for me, after combing his records, names of persons who were engaged in subversive activities and subject to deportation, . . . racketeers and undesirables who were here in the country and subject to deportation . . . ." To carry out his program the Attorney General required a "progress report" to be submitted to him every day concerning the activities of the previous day. Accardi, he said, had been defined by him as a racketeer because of information received from the FBI, and that was the reason he "moved to deport him." The record shows that Attorney General Brownell continued to carry out the particular deportation program Attorney General Mc-Granery had begun. On April 3, the day the Board of Immigration Appeals decided against Accardi, Attorney General Brownell issued a press release announcing that "Accardi, known as a New Jersey racketeer, is a native of Sicily, Italy, and brother of Samuel Accardi against whom denaturalization proceedings are pending in the Federal court at Newark." Later the Attorney General in a speech referred to Accardi as an "undesirable," and an Assistant Attorney General in a speech listed Accardi among a number of so-called "nationally known hoodlums who are the objects of the program."

It is significant that on the very day Attorney General Brownell referred to Accardi as a "racketeer," the Board of Immigration Appeals found as a fact from evidence that he was "considered a person of good moral character." Moreover, there was no evidence before the Board to show that Accardi was or ever had been a "racketeer." The record therefore establishes that the Attorney General not only prejudged Accardi's case against him but evidently did so on the basis of anonymous information that he was a racketeer. It may be as Judge Frank suggested that in so characterizing Accardi the Attorney General confused him with someone else. However this

may be, the record leaves no doubt that the Attorney General's office decided to deport Accardi on the ground that he was a "racketeer" and that this characterization was continued by the Attorney General long after the Board had refused to suspend Accardi's deportation although finding that he had a good moral character. The Attorney General's prejudgment deprived Accardi of the benefit of the Attorney General's discretion fairly exercised after a hearing as the law prescribes. For this reason the case should be affirmed.

There are also other reasons why I think this judgment should be affirmed and the case sent back to the Board of Immigration Appeals to carry out the directions of the Court of Appeals. Whatever this Court's prior opinion may have meant, the case should not go off on the District Court's finding of fact that the Board of Immigration Appeals actually exercised its own untrammeled discretion despite what the Attorney General said or did. That finding rests almost entirely on testimony given by the Board members themselves denying that they were influenced by the Attorney General's planned program to deport certain named aliens. I deem it bad practice to subject administrative officers, acting in a quasi-judicial capacity, to a probe of the mental processes which led them to decide as they did. That is what the Court sanctions here. We have already decided that this practice is no more desirable than that of probing the minds of judges to try to fathom the reasons which prompt their decisions. *United States* v. *Morgan,* 313 U. S. 409, 421–422.

Whatever the Board members' state of mind may have been, I think the Attorney General's publications placed the Board of Immigration Appeals, the members of which hold office completely at his will, in a position that no judicial agency should be. Copies of newspaper interviews and speeches made by two Attorneys General and

an assistant, which appear in the record, proclaim a strong desire and purpose to carry out a program under which Accardi and a large group of others named from time to time were to be stripped of citizenship and deported from this country. The District Court found that notice of this program was given to the Board. This Court, however, distinguishes between information given to the Secretary of the Board and to the Board itself. But a program of this kind, so well-publicized that it went to every part of the United States and to various political gatherings, could hardly be expected not to permeate the Board of Immigration Appeals working in the Department of Justice in Washington. Orders and proclamations of the Attorney General, head of that Department, cannot be thought to have so little influence or effect in his Department. It is true that the statements and program of the Attorney General are now referred to as intended to do no more than "expedite" action by the Attorney General's subordinates, including the Board of Immigration Appeals. But this program according to the evidence occupied the most prominent place in the Department's activities. Daily reports had to be made to the Department by those men who carried on the program. They were selected because of their outstanding ability and aggressiveness. So what we have is not merely a finding by the District Court that the Attorney General's program was sent to the Board. We have in addition a showing of departmental emphasis on that program which makes it impossible to believe that the subordinates were oblivious to the Attorney General's great interest in deporting the particular men whose names appeared on his "proscribed list" or "program" or "statistical data" as it was variously termed by government witnesses. The requirement for fair administration of justice is not satisfied by a mere finding based on Board members' testimony that this particular Board at this particular time was strong enough

292

to resist the plain implications of the Attorney General's strong program for deportation.

The inevitability of what was to happen to Accardi after his name was put on the "Attorney General's proscribed list of alien deportees" is rather strongly indicated by the fact that not one of these aliens has ever been granted final discretionary relief allowing him to remain in this country. In an effort to show that aliens on the list are not barred from discretionary relief, the Government refers to four specific cases. In two of those cases, however, the aliens were not deportable under existing law and thus the Board did not reach the question of discretionary relief. In the third case the alien was allowed to leave voluntarily instead of being forcibly deported as he otherwise would have been. In the fourth case the Board did actually recommend that deportation be suspended. But that is not the full picture. The hearing officer who had recommended the alien's immediate deportation was investigated after the Board's recommendation of suspension. The Department of Justice concluded that he had been derelict in not fully developing "important derogatory information" concerning the alien and announced that he had been relieved of duty and that disciplinary action would be taken against him.[2] At the instance of the Department, as the Government's brief points out, the Board granted a rehearing on the alien's right to suspension which appears to be still pending. Thus the Attorney General cannot point to a single case in which one of the proscribed aliens has been finally granted a discretionary suspension.

It is my opinion that petitioner proved that the Attorney General's publicized program made it impossible to expect his subordinates to give Accardi's application

---

[2] This information is contained in a Department of Justice press release dated April 6, 1955, which appears in Accardi's supplemental brief. The Department has not denied this press release.

that fair consideration which the law requires. The use of administrative bodies as agencies of justice under law is seriously weakened by proceedings such as these. We should adhere to the spirit of our first opinion and require that the Board hold a fair hearing in Accardi's case after "the recall or cancellation" of this "list" as the Court of Appeals ordered.[3] The implications of the Attorney General's program and statements must be repudiated before this Board can be considered the kind of free and impartial tribunal which our system of justice demands.

---

[3] The Court of Appeals said:

"10. The Attorney General, on April 23, 1954, a few days after the Supreme Court's decision came down, issued instructions that the Board should not be influenced in its decisions by his 'program' but, in each case, should exercise independent judgment.

"11. Accardi must be released from custody unless, within a reasonable time, the Board, under those new instructions, holds a new hearing and renders a new decision on his application for discretionary relief. Although the Board has already found that he has a good moral character, he should have the opportunity at the new hearing to offer evidence that he is not and never has been a racketeer. For it may be that, in so characterizing Accardi, the Attorney General has confused him with someone else of the same name." 219 F. 2d 77, 83.