**YANG You Yi, et al., Petitioners,**

v.

**Janet RENO, Attorney General of the United States, et al., Respondents.**

Civ. A. No. 1:CV–93–1702.

United States District Court, M.D. Pennsylvania.

March 13, 1996.

Lory D. Rosenberg, Washington, DC, for all petitioners.

Patricia A. Butler, Barley, Snyder, Senft & Cohen, York, PA, Beverly J. Points, Barley, Snyder, Senft & Cohen, York, PA, for You Yi Yang.

Beverly J. Points, Barley, Snyder, Senft & Cohen, York, PA, for Bong Won Yee.

Frank Countess, York, PA, Christopher William Reichow, Wilson Elser Moskowitz Edelman & Dicker, Philadelphia, PA, for Guang Feng Li.

Thomas D. O'Shea, York, PA, for Chu–Su Chen.

Craig T. Trebilcock, Stock and Leader, York, PA, for Pin Lin.

Anthony B. Haller, Frances P. Rayer, Pepper, Hamilton & Scheetz, Philadelphia, PA, Robert S. Kitchenoff, Philadelphia, PA, Seth Grossman, Kohn, Nast & Graf, P.C., Philadelphia, PA, Sharon J. Phillips, New York City, David H. Weinstein, Weinstein Kitchenoff Scarlato & Goldman, Philadelphia, PA, for Young Zhong Pan, a/k/a Pu Wing Chun.

E. Paul Cokely, Jr., Lebanon, PA, for So Gee Dong and Fa Yu Zhuang.

Kevin M. Donovan, Morgan, Lewis & Bockius, Philadelphia, PA, for Chang Chun Lu.

John M. Ogden, York, PA, for Xin–Fei Zhang, a/k/a Xin–Fuei Zarang and Tong Wai Zhang.

Stephen D. Converse, York, PA, for Dai Min Lu.

Anthony J. Hom, Hwang and Nix, P.C., Philadelphia, PA, for Shi Chun Zheng.

Joshua D. Cohen, Hartman, Underhill & Brubaker, Lancaster, PA, for Chun Hua Lin.

Lisa A. Baird, Hias and Counsel, Philadelphia, PA, for Xing Chen.

Thomas M. Place, The Dickinson School of Law, Carlisle, PA, Linda S. Hollinger, York, PA, for Shuidi Zheng.

Timothy J. Shultis, Crabbs & Frey, Hanover, PA, for Guo Zhen Xie.

N. Christopher Menges, Menges & Snyder, York, PA, for Li Yun–You.

Vivian B. Narehood, Gibbel, Kraybill & Hess, Lancaster, PA, for Ming Long Lin.

Ann Carr, Lancaster, PA, for Dek Fun Lin and Sing Chou Chung.

Marc G. Tarlow, Kain, Brown & Roberts, York, PA, for Zhong Chen.

Gavin Wayne Markey, York, PA, for Wang Chao Lin and Nan Ren Lin.

Tsiwen M. Law, Hwang & Nix, Philadelphia, PA, for Yeng Ming Lin.

Mary A. McDougall, Morgan, Lewis & Bockius, Philadelphia, PA, for Chan Bin Jong.

Michael Jay Krout, Morris & Vedder, York, PA, for Zeng Hua Zheng.

John R. Elliott, York, PA, for Yung Kwon Cheng.

Jessamyne M. Simon, Jill E. Garfinkle, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Rui Qui Huang.

Cindi L. Dresdner, New York City, Helen Morris, Catholic Legal Immigration Network, Inc., Washington, DC, for Shimu Chen and Fui Lin.

Kurt A. Blake, York, PA, for Gui Lin Cheng.

Jennifer H. Matson, York, PA, Craig Wilson, Wilson & Associates, P.C., New York City, for Ren Yan Yang.

David J. Maisch, Brogue, PA, for Yong Zheng.

Charles Andrew Rausch, York, PA, for Kwai Sung Cheng.

Daniel M. Pell, York, PA, for Xue Kian Chen.

Joseph McHale, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Yi Hong Lin.

Frank Countess, York, PA, for Gou Zhi Lee.

Emma L. Oh, Asian Law Center, Philadelphia, PA, for Jian Le Shi.

Melanie Albert Zampini, York, PA, for Wu Chao.

Gerald A. Lord, Miller & Poole, York, PA, for Xing–Kwong Zheng aka Xing–Ke Zheng.

Loura A. Selfe, Atlee & Hall, Lancaster, PA, for Xue Yao Lin.

Timothy J. Bergere, Philadelphia, PA, Willan F. Joseph, Montgomery, McCracken, ·Walker & Rhoads, Philadelphia, PA, for Jian Bin Lin.

Terry Peyser Blynn, York, PA, for Wing Jong Jung.

Hanna A. Dunlap, Barley Snyder Senft & Cohen, Lancaster, PA, for Bin Hua Zheng.

Katherine Pandelidis Granbois, Harrisburg, PA, for Xiang Gui Cao.

Judith Musselman, Harrisburg, PA, for Zuoxun Lee.

Sarah M. Bricknell, Buchanan Ingersoll, P.C., Harrisburg, PA, for Chai Kan Cheng.

John B. Consevage, Buchanan Ingersoll, Harrisburg, PA, for Ai Ming Wang and Xu Yong Lu.

William D. Lenahan, Buchanan Ingersoll, P.C., Harrisburg, PA, for Jar Jian Wang.

Eileen Shimizu, Philadelphia, PA, for He Ping Cao, Zeng–Ping Lui, Kou Zhang Cheng, Gong Shi, and Cai Wan Chen.

William H. Poole, Jr., York, PA, for Yue Feng Lee.

Jared Ward Ingersoll, Hanover, PA, for Zhao Shan Zhao.

Enid H. Adler, North Wales, PA, for Fen–Hou Chen.

Craig Wilson, Wilson & Associates, P.C., New York City, for Chong Sheng Qu and Bao Qiao Zhang aka Chun Po Chow.

Xue–Dee Chen, York, PA, pro se.

Mao–Jiang Lin, York, PA, pro se.

Katherene Holtzinger Conner, York, PA, for Mao–Jiang Lin.

Wen–Hao Chen, York, PA, pro se.

Kathleen Prendergast, York, PA, for Wen–Hao Chen.

Jian Fu Chai, York, PA, pro se.

De Hui Chen, York, PA, pro se.

Ji Li Zheng, York, PA, pro se.

Fu Sing Zheng, York, PA, pro se.

Michael Bortner, Harrisburg, PA, for Fu Sing Zheng.

Ye Zing Chai, York, PA, pro se.

Robert E. Porges, New York City, for Ye Zing Chai, Shi J Zheng, Lian Bing Zheng, Xue Can Zou, Xye Rong Zhan, Yue Feng Zhang, Hua Yi Zhon, You Shui Wang, Si Ou, Pan Shao Min, Duan Sheng Lin, Wor Oi Chin, Zhu F. Cheng, Guo Cheng Lin, Xin Sing Zhou and Guan Jun Wang.

Fa Yu Zhuang, York, PA, pro se.

Shi J Zheng, York, PA, pro se.

Zhong Zhou, York, PA, pro se.

Xiaomin Chen, Porges Law Offices, New York City, for Zhong Zhou.

Lian Bing Zheng, York, PA, pro se.

Zhai Young Zhu, York, PA, pro se.

Joel H. Cavadel, York, PA, for Zhai Young Zhu.

Xue Can Zou, York, PA, pro se.

Xye Rong Zhan, York, PA, pro se.

Au Zia Zhao, York, PA, pro se.

Yue Feng Zhang, York, PA, pro se.

Da He Zheng, York, PA, pro se.

Shan Cien Zhang, York, PA, pro se.

Nan Wei Zhang, York, PA, pro se.

Hua Yi Zhon, York, PA, pro se.

Ye Song, York, PA, pro se.

Gin Guan Wu, York, PA, pro se.

Ram M. Cheerath, York, PA, for Gin Guan Wu.

Yee Jan Wong, York, PA, pro se.

Xin Chang Shang, York, PA, pro se.

Zhong Wu Luo, York, PA, pro se.

Helen Morris, Catholic Legal Immigration Network, Inc., Washington, DC, for Zhong Wu Luo and Jian Yun Wan.

Huseh Ta Tang, York, PA, pro se.

Wang Wu Dong, York, PA, pro se.

You Shui Wang, York, PA, pro se.

Zim Sheng Whang, York, PA, pro se.

Si Ou, York, PA, pro se.

Li Tun Cheng, York, PA, pro se.

Pan Shao Min, York, PA, pro se.

You Quan Lin, York, PA, pro se.

Bi Sheng Liu, York, PA, pro se.

Xu Yong Lu, York, PA, pro se.

Lu Tian Hao, York, PA, pro se.

Ram M. Cheerath, York, PA, Helen Morris, Catholic Legal Immigration Network, Inc., Washington, DC, for Lu Tian Hao.

Ghuan Li Liu, York, PA, pro se.

Rui Kan Lin, York, PA, pro se.

Xiang Keng Lin, York, PA, pro se.

Kong Zhi Li, York, PA, pro se.

Duan Sheng Lin, York, PA, pro se.

Zhon Guan Li, York, PA, pro se.

Jin Lim Fu, York, PA, pro se.

Zhe Shung Jain, York, PA, pro se.

Hyei Gwor, York, PA, pro se.

Martina Bernstein, Morgan, Lewis & Brockius, Philadelphia, PA, for Hyei Gwor.

Wing–Hon Cheng, York, PA, pro se.

Dai Zi He, York, PA, pro se.

Paul S. Kline, Harrisburg, PA, for Dai Zi He.

Zhi Ping Gao, York, PA, pro se.

Xiang Nmu Gao, York, PA, pro se.

Yi Cheng Dong, York, PA, pro se.

Ei Young Giang, York, PA, pro se.

Son Shing Dong, York, PA, pro se.

Jia Reng Dong, York, PA, pro se.

Wiliam J. Trappen, Philadelphia, PA, for Jia Reng Dong.

Chi Chi Chung, York, PA, pro se.

Wor Oi Chin, York, PA, pro se.

Zhu F. Cheng, York, PA, pro se.

Son Ching Cheng, York, PA, pro se.

Gin Sen Cheng, York, PA, pro se.

Tia Sian Chen, York, PA, pro se.

Kan Guan Chen, York, PA, pro se.

Kai Q Zeng, York, PA, pro se.

Muriel Crabbs, Hanover, PA, for Kai Q Zeng.

Guo Cheng Lin, York, PA, pro se.

Xiang Guan Cai, York, PA, pro se.

Patricia R. Marcus, York, PA, for Xiang Guan Cai.

Xin Sing Zhou, York, PA, pro se.

Yong Qui Chi, York, PA, pro se.

Yong Ging Wu, York, PA, pro se.

Craig Wilson, Wilson & Associates, P.C., New York City, for Yong Ging Wu, Cian Gluan Yong, Cheng Ye Wu, Ming Guang Liu, Chun Lin Jin, Jan Yon Chung, Zhen Huan Weng, Kang Di Weng, Cheng Xiao Dai, and Guo Ping Ye.

Cian Gluan Yong, York, PA, pro se.

Cheng Ye Wu, York, PA, pro se.

Ming Guang Liu, York, PA, pro se.

Chun Lin Jin, York, PA, pro se.

Jan Yon Chung, York, PA, pro se.

Edward L. Crow, York, PA, for Chang Qing Zhou.

Eileen C. Shimizu, Philadelphia, PA, for Mei Xi Chen.

Jian Biao Weng, York, PA, pro se.

Daniel H. Shertzer, Jr., Lancaster, PA, for Dar Hua Wang.

Carl J. Anderson, Philadelphia, PA, for Zhe Shung Jan.

Melvin H. Hess, Gibbel, Kraybill & Hess, Lancaster, PA, Vivian B. Narehood, Gibbel, Kraybill & Hess, Lancaster, PA, for Zhong Ming Tian.

Jian Yun Wan, York, PA, pro se.

Jia Wen Liu, York, PA, pro se.

Bao Jin Lui, York, PA, pro se.

Jeffrey A. Ernico, Buchanan Ingersoll Professional Corp., Harrisburg, PA, for Zhang Song Zhong.

Gloriana Noreika, Stetler & Gribbin, York, PA, Joel H. Cavadel, Stetler & Gribbin, York, PA, for Xin Bin Zheng.

Robert R. Long, Jr., Assistant U.S. Attorney, Lewisburg, PA, Lauri Stephen Filppu, Office of Immigration Litigation, Washington, DC, Philemina McNeill Jones, Office of Immigration Litigation, Washington, DC, Edward J. Duffy, U.S. Dept. of Justice, Dept. of Immig. Litigation, Civil Division, Washington, DC, for George Maugans, District Counsel of the United States Immigration and Naturalization Service–Baltimore District, David L. Milhollen, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals, Richard J. Sharkey, District Counsel of the U.S. Immigration and Naturalization Service–Philadelphia District, J. Scott Blackman, District Director of the U.S. Immigration and Naturalization Service–Philadelphia District, United States Immigration and Naturalization Service, Executive Office for Immigration Review, Richard Sharkey, District Director of the U.S. Immigration and Naturalization Service, Janet Reno, Attorney General of the United States, and Doris Meissner, Commissioner of the U.S. Immigration and Naturalization Service.

Joseph J. Terz, United States Attorney's Office, Harrisburg, PA, Robert R. Long, Jr., Assistant U.S. Attorney, Lewisburg, PA, Stewart Deutsch, Kristin A. Cabral, John J. Andre, Norah Ascoli Schwartz, David M. McConnell, April Gordon Dawson, Nelda C. Reyna, Edward J. Duffy, Stephen W. Funk, James A. Hunolt, Kristin A. Cabral, Leah Loebl and Jeffrey J. Bernstein, Office of Immigration Litigation, Washington, DC, for all respondents.

Gordon Quan, Chair, Immigration Comm. Asian Pacific Amer. Bar Assn., Houston, TX, for National Asian Pacific American Bar Association, amicus curiae.

### MEMORANDUM

RAMBO, Chief Judge.

On January 24, 1996, the court issued an order denying Petitioners' motion for an evidentiary hearing on the claim that the adjudication of their exclusion proceedings was prejudiced by political interference and *ex parte* communications. This memorandum is issued in support of that order.

### Background

The instant action arises out of the detention and attempted exclusion by the Immigration and Naturalization Service ("INS") of certain citizens of the People's Republic of China ("PRC"). The aliens at issue were among those arrested and detained after the grounding of the *Golden Venture* in New York Harbor in June 1993.

When the *Golden Venture* ran aground, several hundred aliens being smuggled into the United States jumped overboard in an attempt to reach land. Several drowned and nearly three hundred were arrested and detained by the INS. Approximately 145 of those individuals subsequently were transferred to the York County Prison, a facility located in the Middle District of Pennsylvania. Many of the detainees, including the individual Petitioners in this action, filed claims for asylum. At the prison, exclusion proceedings under 8 U.S.C. § 1226(a) were instituted against the detainees. Ultimately, immigration judges ("IJs") heard and rejected the asylum claims of the instant Petitioners. Petitioners appealed to the Board of Immigration Appeals ("BIA") and, after the BIA dismissed their appeals, filed the present habeas actions.

On November 15, 1993, this court ordered the consolidation of the individual actions because the individual petitions appeared to present substantially similar claims. All related claims now are proceeding under the captioned case and later-filed petitions have been included in the interim relief provided by this court.

At the outset of this litigation, Petitioners asserted that the Clinton Administration ("the Administration") exercised political influence to dictate the denial of their claims for asylum and withholding of deportation. On December 7, 1993, the court granted Petitioners request that they be permitted to take discovery from the government in connection with this allegation. In doing so, the

court stated that Petitioners would be granted an evidentiary hearing on the allegations of bias or political interference only upon a "strong showing" of impropriety by administrative officials. Dec. 7, 1993 Mem. at 7. Discovery has been completed and the court now turns to the evidence which has emerged.

## Discussion

### I. The Evidence

Petitioners contend that in the summer of 1993 there were improper contacts between personnel of the Executive Office for Immigration Review ("EOIR") and officials of the Department of Justice ("DOJ") and the National Security Counsel ("NSC"). EOIR, a subagency of DOJ, consists in part of IJs and the BIA, whose responsibilities include adjudicating requests for asylum under the Immigration and Nationality Act. Petitioners maintain that the alleged improper contacts caused the IJs and the BIA to be biased against them in the adjudication of their asylum claims. Respondents acknowledge that DOJ and NSC staff had contact with EOIR personnel regarding Petitioners' exclusion proceedings. However, they deny that DOJ or NSC staff communicated with EOIR adjudicators regarding the merits of Petitioners' claims or otherwise adversely affected the *outcome* of Petitioners' proceedings. The record developed in this case is voluminous, and in reviewing the evidence the court will focus upon what it considers to be most relevant.

The central figure in the EOIR contacts with DOJ and the NSC in the summer of 1993 was Gerald Hurwitz, then Counsel to EOIR Director David Milhollan. At that time, Milhollan held both the positions of EOIR Director and Chairman of the BIA. Hurwitz described his responsibilities as Counsel to EOIR Director as defending EOIR in litigation, writing regulations, providing legal advice to employees of the agency, and attending meetings and acting as liaison with agencies or organizations both inside and outside DOJ. (Hurwitz Dep. at 9, Respondent's Exhibit 2.) Hurwitz further stated that he acted as a "buffer" for IJs and the BIA by responding to "outside inquiries, particularly press inquiries," regarding matters before EOIR adjudicators. (*Id.* at 10.) Counsel to EOIR Director is not an EOIR adjudicator.

### A. Hurwitz' Contacts With Coven Regarding Expediting The Golden Venture Proceedings

A few days after the *Golden Venture* ran aground, Phyllis Coven, then an Assistant to the Attorney General, contacted Hurwitz and asked that he prepare a plan to expedite the exclusion proceedings of the *Golden Venture* passengers. Hurwitz was initially told that this request originated with the Attorney General, and he subsequently learned "that it was part of a larger plan that came from the White House." (Hurwitz Dep. at 159–60, Petitioners' Exhibit 3.) Hurwitz drafted a proposed plan to expedite the hearings and gave it to Coven, who in turn provided it to staff members of the NSC and the Domestic Policy Counsel ("DPC"). (Petitioners' Exhibits 14–17.) The final version of this plan indicates that EOIR mobilized its resources in an attempt complete the hearing process for *Golden Venture* passengers, through administrative appeal, in 120 days. In the plan, Hurwitz stated that he would "pay particular attention to time savings in administrative areas, such as preparation of transcripts, transmission of files and tapes, immediate scheduling of initial proceedings and transmission of applications for review by the State Department...." (Petitioners' Exhibit 17 at 3.) Following an outline of the proposed expedited hearing process in the memorandum, Hurwitz stated:

> It should be stressed that the above-referenced time lines constitute an estimate of a best case scenario in which everything runs smoothly. If matters become complicated by legal issues, administrative problems, unavailability of counsel, illness of the parties or other unforeseen circumstances, time frames could run longer. We will do everything possible consistent with due process to reach the above-referenced goal.

(*Id.* at 4.) Petitioners believe that it is significant that in the last section of the memo-

randum, entitled "Additional Comments and Suggestions," Hurwitz stated:

It would also be helpful for the Attorney General, or the Associate Attorney General, in writing, to advise and direct that the above-referenced smuggled alien cases are to be treated as emergency matters and that everything must be done expeditiously to complete them consistent with due process. This will give both our IJs and the BIA additional authority in which to act in a most expeditious fashion. It will make clear the emergency nature of these proceedings in the event that they are attacked in court as being handled differently than other cases.

.    .    .    .    .

I understand that there are a number of final orders of exclusion/deportation which have already resulted in earlier similar cases. It is my understanding that few, if any, of these individuals have actually been deported. This can be verified by INS. If the Department wishes to make an immediate impact on the situation [regarding the influx of Chinese smuggled aliens], the Department may wish to consider executing these final orders of deportation. That is something that can be done immediately and will have a significant impact without waiting for the group of case in question to be completed.

(*Id.* at 5.)

## B. Hurwitz' Attendance At Border Security Working Group Meetings

Hurwitz was invited by Coven to attend meetings of the Border Security Working Group ("BSWG"), which included representatives of the NSC, DPC, INS and numerous other federal agencies. Hurwitz attended several BSWG meetings at which there was discussion concerning the development of policy to deal with the problem of alien smuggling, and some conversation about the *Golden Venture* cases in particular. Hurwitz testified that the reason he attended the meetings was to appraise BSWG attendees of the status of Petitioners' cases, to learn of any developments which may affect EOIR operations, and, if necessary, to inform other agencies of what those effects would be. He

stated that part of his function as Counsel to EOIR Director was to attend such meeting since it would be inappropriate for EOIR adjudicators to do so. (Hurwitz Dep. at 99, 151, Respondents' Exhibit 3.)

It is of particular concern to Petitioners that at these meetings Hurwitz was exposed to discussion of the concept of a "magnet effect." He testified that he understood this to mean "[t]hat if people come to the United States and are allowed to stay here ... more will come." (Hurwitz Dep. at 76., Petitioners' Exhibit 9.) Furthermore, Grover Rees, former General Counsel of INS, testified that during some BSWG meetings the view was expressed that allowing asylum on the basis of China's coercive family planning policy tends to attract asylum applications based upon false claims. (Rees Dep. at 297–98, 673–74, Petitioners' Exhibit 4.) Rees stated that, "to the best of [his] recollection," Hurwitz attended at least one such meeting. (*Id.* at 674.) Rees also testified that at some BSWG meetings it was asserted that the United States' "relatively generous asylum policy towards Chinese applicants" caused a magnet effect and aggravated the alien smuggling problem. (*Id.* at 915.) While it is not clear precisely what information Hurwitz was exposed to at the BSWG meetings, it is evident that he understood that the Clinton Administration was pursuing a policy to deter alien smuggling and wanted the *Golden Venture* hearings expedited in furtherance of that policy. (Hurwitz Dep. at 54, Petitioners' Exhibit 3.)

## C. Schwartz' Telephone Call To Hurwitz

Hurwitz testified that sometime during Petitioners' proceedings he received a telephone call about the cases from Eric Schwartz, a staff member of the NSC. With regard to the call, Hurwitz stated:

he requested that the cases be expedited. And I told him that we were already expediting the cases and we had to do it—I made it very clear that we had to do it consistent with due process and he agreed very readily to that. He said, of course I wouldn't want to not have it done consistent with due process.

(Hurwitz Dep. at 160, Petitioners' Exhibit 3.) Hurwitz further stated that Schwartz may have remarked that the National Security Advisor, Anthony Lake, was concerned that Petitioners' proceedings be expedited. (*Id.* at 161.) When asked by Petitioners' counsel whether he had received similar calls from NSC or White House staff in the past, Hurwitz responded:

No. This is the only time that I can think of. But I will also say that we didn't do anything special in reaction to that. As a matter of fact, we didn't do anything differently than what we were doing.

(*Id.* at 162.)

### D. Availability Of Continuances During Petitioners' Hearings

Two attorneys who represented individual Petitioners in their exclusion proceedings have asserted that they were informed that continuances of merits hearings were not available to Petitioners due to a policy imposed upon IJs by DOJ and/or the White House. Attorney Ann Carr stated that she received this information from an unnamed immigration court clerk, and attorney Elisa Massimino stated that an unnamed INS trial attorney advised her of the policy. (Petitioners' Exhibit 27.) When questioned about this matter subsequent to executing the affidavit relied upon by Petitioners, Carr stated:

I would say that the clerk's report of what the White House had told them concerned a request that the cases be expedited. As to whether the White House had specifically said no continuances, that being a—kind of an implementation of that expediting, I'm not sure that she said that the White House used the word continuances.

(Carr Dep. at 56–57, Respondents' Exhibit 19.) The roughly 25 IJs who presided over Petitioners' exclusion proceedings have flatly denied the existence of a no-continuance policy. (Responses of Immigration Judges to Petitioners' Interrogatories, Respondents' Discovery Exhibit 3, filed July 22, 1994.)

Respondents contend that the records in Petitioners' exclusion proceedings demonstrate that continuances of merits hearings were, in fact, generally granted. Respondents reviewed the administrative records of the 108 Petitioners who remained in the captioned action as of October 1, 1995, and summarized their findings as follows:

The government's review found that 65 of 108 petitioners requested continuances of their merits hearings, either in written motions or by oral request at hearings. Of these 65 requests for continuances, 53 were granted by Immigration Judges (81.5% of the requests). The average length of each continuance granted was 20 days. Of the 12 cases in which the IJs denied requests for continuances, four were reversed on appeal by the BIA, and these cases were remanded to the IJs for further proceedings. The IJs and BIA thus granted 57 out of petitioners' 65 requests for continuances of merits hearings, for a combined grant rate of 88%. The total number of requests for continuances of merits hearings which were denied by the IJs and BIA was eight, or 7% of the 108 cases.

(Respondents' brief at 51.) Petitioners do not dispute these statistics in their reply brief.

### E. Hurwitz' Communication With EOIR Adjudicators About His Contacts With Justice Department And White House Officials

#### 1. Coven's Request That Proceedings Be Expedited

Hurwitz provided the memorandum which he prepared for Assistant to the Attorney General Coven regarding the expedited hearing program to two EOIR adjudicators, EOIR Director/BIA Chairman Milhollan and Assistant Chief Immigration Judge ("ACIJ") Thomas Pullen. Milhollan stated that he saw the memorandum only after it was completed and did not contribute to its content. (Milhollan Dep. at 30–31, Respondents' Exhibit 7.) ACIJ Pullen, who was responsible for organizing the processing of Petitioners' exclusion proceedings, consulted with Hurwitz on the development of the expedited processing plan. (Pullen Dep. at 35, Respondents' Exhibit 8.) Pullen stated that he was aware that the plan to expedite the hearings was undertaken in response to a request from Assistant to the Attorney General Coven.

(*Id.* at 50.) He further indicated that it would have been necessary for him to communicate with certain immigration court administrators about the content of the memorandum. (*Id.* at 43.) However, there is no evidence that either Milhollan or Pullen discussed the memorandum, or the Attorney General's interest in expediting the proceedings, with other EOIR adjudicators.

### 2. BSWG Meetings

Hurwitz communicated with EOIR Director/BIA Chairman Milhollan about BSWG meetings which he attended. At his first deposition, Hurwitz stated:

> I think I gave the Director very general information, you know, that there was this meeting, there was some status reports discussed on the Golden Venture cases. That would be about the extent of it. I didn't give him a lot of detail. I didn't think it was necessary.

(Hurwitz Dep. at 52–53, Petitioners' Exhibit 3.) Later in the same deposition, Hurwitz testified: "With regard to meetings I went to, I might tell him that I attended a meeting, give him the general nature of the meeting, but not discuss any specifics of it." (*Id.* at 158.) At his second deposition, the following colloquy occurred between Petitioners' counsel and Hurwitz with respect to the same subject:

> Q: Do you recall ... what of this information, if any, you reported to Mr. Milhollan about?
>
> A: Well, I couldn't give you an exact recitation of what I reported to him. But I can tell you, in a general sense, that I basically told him that the meetings had occurred; that ... status reports were given.
>
> And I would have given him any information ... that would have been relevant to our administration of the program.
>
> And that's really about all I would have told him.
>
> Q: Do you remember if you gave him any information about the reasons for the program, or why the Administration had a concern, such as, they say there's more boats that may be coming, or things of that effect?

> A: No. I—I don't. As I say, I don't recall the exact discussion. But that would have been inconsistent with my role, and what ... I would have told him.
>
> I would have told him operational things, things he needed to know. He would not have needed to know that.

(Hurwitz Dep. at 97–98, Petitioners' Exhibit 9.) Nevertheless, according to Hurwitz, Milhollan was aware that the Clinton Administration was developing a program to deter alien smuggling and that EOIR was "part of it." (Hurwitz Dep. at 54, Petitioners' Exhibit 3.)

Milhollan was not asked at deposition whether he communicated with other EOIR adjudicators about what Hurwitz related to him concerning BSWG meetings, and Petitioners have introduced no evidence that he did so. Furthermore, Petitioners have introduced no evidence that Hurwitz communicated with EOIR adjudicators other than Milhollan about the BSWG meetings.

### 3. Schwartz Telephone Call

Hurwitz informed both Milhollan and Pullen of Schwartz' request that the hearings be expedited. When asked why he did so, Hurwitz stated: "I passed it on to Tom Pullen and the Director only because it was a novelty that the White House had called. But there was an understanding that nothing would be done about it." (Hurwitz Dep. at 164, Petitioners' Exhibit 3.) The following colloquy ensued between Petitioners' counsel and Hurwitz:

> Q: Isn't that rather inconsistent with your role as a buffer to pass this information on to the chairman of the BIA?
>
> A: No. No. Because I didn't see it as being of any import.
>
> Q: Do your think they might have seen it as being of any import?
>
> A: No. No. And as I say, they didn't do anything, they didn't react to it and change anything because of that phone call. And the substance of the call was, as I mentioned, that after he requested expedition, I told him we were already expediting the cases and we were going to do it—handle these cases fairly and he was in total

agreement with that. So I considered it not to be particularly important. (*Id.*) Petitioners have introduced no evidence that the Schwartz call was discussed with other EOIR adjudicators by Hurwitz, Milhollan or Pullen.

#### 4. EOIR Adjudicators Other Than Milhollan And Pullen

The approximately 25 IJs who presided over Petitioners' exclusion proceedings have denied any knowledge of a DOJ or White House policy that continuances were to be denied in *Golden Venture* cases. The IJs have further denied any knowledge that the White House or DOJ were concerned about the outcome of Petitioners' cases, or that White House, DOJ or EOIR staff otherwise attempted to influence the disposition of Petitioners' cases. (Responses of Immigration Judges to Petitioners' Interrogatories, Respondents' Discovery Exhibit 3, filed July 22, 1994.) One IJ testified that he was aware that Petitioners' hearings were expedited at the instruction of DOJ. (Sandron Dep. at 48–49, Petitioners' Exhibit 25.)

Petitioners deposed four BIA members other than Milhollan: Fred Vacca, James Morris, Mary Maguire Dunne and Michael Heilman. Dunne, Vacca and Heilman testified that they were unaware of a Clinton Administration desire that Petitioners' proceedings be expedited in order to deter future alien smuggling. (Dunne Dep. at 43–44, Respondents' Exhibit 23; Vacca Dep. at 8, Respondents' Exhibit 25; Heilman Dep. at 32, Respondents' Exhibit 27.) When Morris was asked about the existence of such a policy he stated that he did not recall one. (Morris Dep. at 15, 17, Respondents' Exhibit 28.) All four BIA members also stated that they were not aware of Hurwitz' contacts with BSWG. (Dunne Dep. at 22–23, 45–46, Respondents' Exhibit 23; Vacca Dep. at 9, Respondents' Exhibit 25; Heilman Dep. at 44–46, Respondents' Exhibit 27.)

Petitioners note that, in fact, the BIA issued decisions in the appeals of two individual Petitioners which stated that "the Clinton Administration" had "indicated for some time" that cases involving smuggled aliens, including the *Golden Venture* cases, "would receive expedited treatment as a disincentive to future smuggling." These statements occurred in the appeals of Bong Won Yee (A72–762–042), decided by BIA members Morris, Vacca and Alan Page, and Yang You Yi (A72–761–986), decided by Milhollan, Morris and Page.

As to the inconsistency between Vacca's statement in the Bong Won Yee appeal and his deposition testimony, Respondents' argue that it is not surprising that he would have forgotten the content of one sentence in a decision issued several years prior to the deposition. Moreover, Respondents emphasize that there were newspaper articles in the record before the BIA in these two cases discussing the Clinton Administration's expedite to deter policy. Consequently, Respondents argue, the statements in the BIA opinions do not evince contacts between the Administration and the BIA. (Bong Won Yee Administrative Record ("A.R.") at 39–42, Respondents' Exhibit 33; Yang You Yi A.R. at 114–117, Respondents' Exhibit 34.)

### II. The Standards

#### A. Political Interference

In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) ("*Accardi I*"), and *Shaughnessy v. U.S. ex rel. Accardi*, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955) ("*Accardi II*"), the Supreme Court set forth the standard for determining whether an alien's immigration proceedings may be invalidated on the ground of political interference. In *Accardi*, the petitioner alleged that the BIA denied his application for suspension of deportation due to the Attorney General's issuance of "a confidential list of 'unsavory characters' including petitioner's name ..." which the Attorney General "planned to deport." *Accardi I*, 347 U.S. at 262, 267, 74 S.Ct. at 500, 503. The petitioner further asserted that the list was circulated among BIA members. *Id.* at 262, 74 S.Ct. at 500. The District Court refused to receive evidence on this claim and dismissed the petitioner's writ of habeas corpus, and the Court of Appeals affirmed. The Supreme Court reversed, emphasizing that the petitioner's

allegations amounted to a claim that the Attorney General "dictat[ed] the Board's decision" and that the Board "fail[ed] to exercise its own discretion." *Id.* at 267–68, 74 S.Ct. at 503–04. The Court stated that if the petitioner could prove these allegations he would be entitled to a new hearing before the Board. *Id.* at 268, 74 S.Ct. at 503–04.

On remand, after receiving evidence, the District Court concluded that the BIA had reached its decision independently and dismissed the petitioner's writ of habeas corpus. The Court of Appeals reversed on the ground that the " 'Attorney General's statements had *unconsciously* influenced the Board members so that they felt obliged not to exercise their discretion and, without doing so, to decide against Accardi.' " *Accardi II,* 349 U.S. at 282, 75 S.Ct. at 747 (emphasis in original; brackets omitted). The Supreme Court reversed the Court of Appeals, stating that the petitioner had to prove "that a majority of the Board not only knew of the 'list' but were affected by it." *Id.* The record indicated that of five Board members at least one acknowledged knowing of the Attorney General's desire to deport the petitioner, and another stated that he "may have known." *Id.* at 283, 75 S.Ct. at 747. Nevertheless, the Supreme Court accepted the Board's position that its judgment had not been affected by the Attorney General. *Id.*

### B. *Ex Parte* Communications

■ "For obvious reasons of adversarial fairness, *ex parte* communications between judge and litigant are strongly disfavored. They are tolerated of necessity, however, where related to non-merits issues, for administrative matters, and in emergency circumstances." *In re School Asbestos Litigation,* 977 F.2d 764, 789 (3d Cir.1992).

### C. Deference To EOIR Adjudicators

■ The decisions of EOIR adjudicators are entitled to a "presumption of regularity," and a party alleging irregularity bears the burden of proving it. *McLeod v. Immigration and Naturalization Service,* 802 F.2d 89, 95 n. 8 (3d Cir.1986). Consequently, in order to warrant a hearing on their claim of political interference and *ex parte* communications, Petitioners must make a "strong showing" of impropriety by administrative officials. *Citizens of Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971).[1]

### III. Application

■ The theory underlying Petitioners' political interference claim is essentially that the Clinton Administration communicated its "expedite to deter" policy to Hurwitz, who in turn passed it on to EOIR adjudicators. Petitioners reason that since higher rates of deportation will do more to deter alien smuggling than lower rates, EOIR adjudicators understood the Administration to desire high rates of deportation in Petitioners' cases.[2] Petitioners maintain that EOIR adjudicators deferred to this tacit Administration request and were thus biased against Petitioners in the adjudication of their exclusion proceedings. Furthermore, Petitioners believe that Hurwitz served as a conduit for *ex parte*

1. In the court's memorandum dated December 7, 1993, the court set forth the authority which it relies upon to conclude that, on sufficient showing by Petitioners, it must conduct an evidentiary hearing on the political interference claim rather than limiting itself to Petitioners' individual administrative records.

2. Petitioners at times suggest that the implementation of an expedite to deter policy directed at smuggled aliens necessarily envisions an increase in deportation rates since expeditiously granting asylum to smuggled aliens would not deter additional smuggling. This view could be sensible if it were the case that, prior to the implementation of the policy, asylum were being granted to a substantial majority of smuggled alien applicants. Absent this assumption, how-

ever, the policy does not necessarily imply an increase in deportation rates. Assuming, for example, a constant 50% asylum grant rate before and after implementation of the policy, it may deter smuggling if the applicants who are denied asylum are detained pending disposition of their claims and returned home expeditiously, rather than being paroled into the United States during drawn out proceedings. It is not the court's place to speak to the merits of such a policy. The court merely notes that an expedite to deter policy is not logically dependent for its effectiveness upon increasing deportation rates. Of course, the court agrees with Petitioners that higher rates of deportation would advance the objective of the expedite to deter policy, and this fact must have been plain to EOIR adjudicators.

communications of prejudicial material from various BSWG attendees to EOIR adjudicators.

The record discloses that, at a minimum, several EOIR adjudicators were aware that Petitioners' exclusion proceedings were expedited in furtherance of the Administration's efforts to deter alien smuggling. However, a substantial majority of the EOIR adjudicators deny having knowledge of this fact at the time of Petitioners' exclusion proceedings. More importantly, even those who acknowledge being aware of the purpose behind expediting the proceedings deny divining from it a message from the Administration that Petitioners should be deported in large numbers regardless of the merits of their claims. Also, both Hurwitz and EOIR adjudicators deny that Hurwitz conveyed to the adjudicators any information relating to the *merits* of Petitioners' claims.

■ *Accardi II* makes clear that a finding of political interference may not be based upon speculation that EOIR adjudicators were unconsciously influenced by the Clinton Administration's alleged desire that Petitioners be deported. 349 U.S. at 282, 75 S.Ct. at 747. Rather, *Accardi II* places on Petitioners the burden of proving that EOIR adjudicators "not only knew of the [Administration's desire] *but were affected by it.*" *Id.* They must establish that EOIR adjudicators failed to exercise their own discretion and instead allowed the Administration to dictate the outcome of Petitioners' cases. *Accardi I,* 347 U.S. at 267–68, 74 S.Ct. at 503–04.

A finding of political interference in this case would require a determination that Hurwitz, and the many EOIR adjudicators who were deposed and/or answered interrogatories, are lying. Indeed, it appears that a principle reason that Petitioners want an evidentiary hearing is so that the court may take live testimony from the IJs and BIA members who adjudicated their claims and assess their credibility. Petitioners seek a determination by the court that EOIR adjudicators have uniformly lied to conceal their conscious submission to the Administration's desire to deport them without regard to the merits of their claims. Under *McLeod* and *Volpe,* the court may only endeavor to make

such judgments on a strong showing of bad faith by administrative officials. While Petitioners have demonstrated that a number of EOIR adjudicators were aware that Petitioners' proceedings were expedited pursuant to the Administration's expedite to deter policy, they have not shown bad faith on the part of EOIR adjudicators. Accordingly, the court must deny Petitioners' request for an evidentiary hearing on their political interference claim.

## IV. Other Claims

As noted above, on December 7, 1993, the court granted Petitioners leave to take discovery on the claim that the Clinton Administration dictated the denial of their claims for asylum and withholding of deportation. In the instant motion for an evidentiary hearing on the political interference issue, Petitioners have raised a number of related claims which must be addressed separately.

### A. *Ex Parte* Communications

■ It appears that Petitioners assert that the existence of *ex parte* communications between EOIR adjudicators and Administration staff, via Hurwitz, provide a basis to invalidate their exclusion proceedings independent of the political interference argument. They argue that EOIR adjudicators failed to comply with their ethical obligation to reveal the content of these *ex parte* communications, and that the *ex parte* communications violated the Administrative Procedures Act. However, as set forth above, Petitioners have not produced evidence indicating that Hurwitz or any representative of the Administration discussed matters relating to the merits of Petitioners' claims with any EOIR adjudicator. Consequently, Petitioners are not entitled to an evidentiary hearing to show that EOIR adjudicators are lying by denying the occurrence of *ex parte* communications.

### B. Procedural Deficiencies In Hearings

■ Petitioners contend that the adjudication of their claims pursuant to EOIR's 120 day plan was prejudicial in itself because it denied them an opportunity to adequately prepare for their merits hearings. In sup-

port of this claim, they cite (1) the alleged no-continuance policy, and (2) the testimony of BIA member Fred Vacca. As set forth above, *supra* at 328, Petitioners have failed to present significant evidence in support of their no-continuance allegations. Thus, the court must determine whether Vacca's testimony alone is adequate to establish that Petitioners' exclusion proceedings were procedurally deficient.

It appears that the 120 day plan provided for approximately thirty work days between an attorney meeting a client and trial. (Respondents' Exhibit 1 at 4–5.) At deposition, Vacca was asked whether, in the context of asylum claims, this period is sufficient to allow an attorney to properly prepare a case. Vacca prefaced his answer by stating that it would be "really speculative." (Vacca Dep. at 50, Respondents' Exhibit 25.) He continued:

I would say that it's unrealistic to think that a good case could be prepared in that time, and to marshal your evidence and everything else.

It's my personal view that it would take longer. But I have no private practice experience.

It's just a guess.

(*Id.* at 50–51.) Vacca's statement is of limited value by virtue of his acknowledgment that it was "really speculative" and "just a guess." Such a statement, by a single BIA member, cannot serve as a basis to invalidate the exclusion proceedings of all Petitioners.

Furthermore, the court notes the testimony of Stephen D. Converse, an immigration lawyer who conducted legal training seminars for Petitioners' *pro bono* counsel. Based upon his experience with detained alien cases, Converse testified that the scheduling of a merits hearing thirty days after the master calendar hearing would be within the normal time frame. (Converse Dep. at 12–13, Respondents' Exhibit 26.) Respondents contend that their review of Petitioners' individual records reveals that on average Petitioners' merits hearings occurred 57 days after initial master calendar hearings, and that the earliest merits hearings occurred 34 days after initial master calendar hearings. (Respondents' Brief at 107–08;

Respondents' Exhibit 12.) Petitioners do not contest the accuracy of Converse's testimony or Respondents' assertions about the actual timing of their merits hearings. Accordingly, the court concludes that Petitioners have not presented significant evidence in support of the claim that their hearings were *per se* procedurally deficient by virtue of the time frame in which they were conducted.

## C. Equal Protection Claim

■ Petitioners contend that their equal protection rights under the United States Constitution were violated when their cases were singled out for prejudicial treatment. While it is improbable that Petitioners are entitled to challenge their exclusion proceedings on constitutional grounds, *Landon v. Plasencia*, 459 U.S. 21, 32–33, 103 S.Ct. 321, 328–30, 74 L.Ed.2d 21 (1982), the court must not reach a constitutional question of this kind unless it is unavoidable, *Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985). The court need not reach the constitutional question because, as set forth above, Petitioners have failed to present significant evidence that the substantive disposition of their asylum claims was adversely affected by their status as *Golden Venture* passengers or Chinese smuggled aliens.

## D. State Department Letters

■ It is a routine part of an asylum hearing that IJs request comments on an application from the Bureau for Human Rights and Humanitarian Affairs ("BHRHA") based upon State Department knowledge of conditions in a particular country. *See* 8 C.F.R. § 208.11. Petitioners maintain that in their cases BHRHA knowingly provided false comments intended to minimize or deny the enforcement of family planning policy by the Chinese government. It appears that Petitioners rely upon evidence, acquired during discovery on the political interference issue, which was not available during the proceedings below.

The court does not have jurisdiction over Petitioners' challenge to their exclusion proceedings based upon BHRHA's alleged pro-

vision of willfully inaccurate information. In the court's memorandum dated December 7, 1993, granting Petitioners discovery on the political interference claim, it excepted that claim from the exhaustion requirement set forth in 8 U.S.C. § 1105a(c). The court reasoned that it would not be an adequate administrative remedy to require IJs and the BIA to pass on the conduct of those to whom they are accountable and at whose pleasure they serve. Dec. 7, 1993 Mem. at 5. This reasoning does not permit the court to excuse failure to exhaust on the issue of the accuracy of BHRHA comments on Petitioners' asylum claims. Petitioners have not advanced an alternative ground for excusing failure to exhaust the issue, nor is the court aware of one. If Petitioners wish to pursue this claim, they may file a motion to reopen with the BIA pursuant to 8 C.F.R. § 3.2, which permits reopening based upon material and previously unavailable evidence.[3]

---

**3.** The court notes that even if Petitioners were able to establish that BHRHA intentionally provided false information regarding the enforcement of family planning policy in China, they would not necessarily be entitled to relief. In addition to proving that they were subject to the policy, Petitioners would also have to prove that it was enforced against them on account of their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see Matter of Chang*, Int. Dec. 3107, 1989 WL 247513 (BIA May 12, 1989); *Immigration and Naturalization Service v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). This type of factual finding is among the most important functions of the EOIR adjudicatory process, and it is there that Petitioners must pursue this issue should they so desire.